*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0012p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

————————————

UNITED STATES OF AMERICA,
>    *Plaintiff-Appellee,*

>    *v.*

>    No. 09-4002

NABEEL MUHAMMED ASHRAF,
>    *Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 08-00472-001—John R. Adams, District Judge.

Argued:  December 9, 2010

Decided and Filed:  January 12, 2011

Before:  GILMAN and GRIFFIN, Circuit Judges; COLLIER, Chief District Judge.[*]

————————————

**COUNSEL**

**ARGUED:**   Edward G. Bryan, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant.   Laura McMullen Ford, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Edward G. Bryan, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant.  Laura McMullen Ford, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

————————————

**OPINION**

————————————

RONALD LEE GILMAN, Circuit Judge.  Nabeel Ashraf, who entered the United States in 1992 on a student visa from Pakistan, was convicted on two counts of willful

————————————

[*] The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

failure to sign travel documents that were necessary for his departure pursuant to a final order of removal entered in 2008. He now appeals the district court's denial of his motion for a judgment of acquittal and its rulings that excluded certain proof that he had sought to present in his defense at trial. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.      Ashraf's failure to obtain documents necessary for his departure

When Ashraf was released from prison in 2008 after serving his 12-month sentence for willfully failing to sign travel documents, he was transferred to the custody of Immigration and Customs Enforcement (ICE) and placed in expedited removal proceedings. He is subject to removal because of his 2003 conviction for being a nonimmigrant alien in possession of firearms or ammunition (the firearms conviction), which is considered an aggravated felony. The government maintains that Ashraf was also removable based on the fact that he had no lawful status in the United States once his student visa had expired and he had not been granted permanent residence. *See Ashraf v. United States*, No. 05 Civ. 80420, at 10 (S.D. Fla. Nov. 30, 2005).

On May 23, 2008, Claudia Babic, an ICE immigration-enforcement agent assigned to Ashraf's case, gave Ashraf various forms concerning his removal from the country. Ashraf refused to sign the forms and instead checked a box indicating his desire to contest his removal, but he did not check any boxes to indicate a specific basis for his objection. The parties dispute whether one of the forms that Ashraf was given was a notice of intent to issue a final administrative removal order or was instead an unsigned copy of the final removal order itself.

On May 27, 2008, Jay Dehmalo, another immigration officer, served a Failure to Comply Form I-229(a) on Ashraf and read him the form's contents, which warned Ashraf of the consequences for failing to comply with a final removal order. Dehmalo mistakenly thought at the time that a final removal order had already been issued against Ashraf, even though such an order was in fact not issued until June 24, 2008.

The government sought to remove Ashraf to Pakistan. Dehmalo, as well as the other ICE officers who dealt with Ashraf, testified that Ashraf refused to sign the travel forms because he insisted that he was a Kuwaiti citizen who objected to being removed to Pakistan. (Ashraf was born and raised in Kuwait by Pakistani parents.) He maintained this position even though the documents in Ashraf's alien file, as well as officials at the Kuwaiti embassy, confirmed that he was a Pakistani and not a Kuwaiti citizen. On the other hand, Ashraf testified that he did not sign the forms during any of his contacts with the various ICE agents because he was contesting his removal from the United States, and not because he disputed his Pakistani citizenship. Ashraf thought that if he signed the forms, he would be admitting that he was removable. He concedes that even if the government had agreed to send him to Kuwait rather than to Pakistan, he still would not have signed the travel documents because he believed that he was not legally removable.

Ashraf also explains that he did not sign the documents related to his removal in May 2008 because he thought that his removal was already final based on his meetings with Babic and Dehmalo, and because he was in the process of contesting what he thought was the final removal order against him. That is why he sent a letter to ICE on June 1, 2008 inquiring as to the proper procedures and deadlines for filing a motion to reopen his final removal order. When he did not receive a response from ICE, he conducted his own independent research and came to the conclusion that he had 90 days to file a motion to reopen the final order of removal against him. Ashraf then prepared a 40-page brief with exhibits and affidavits in support of his motion. Based on instructions that he received from the immigration court in late July 2008, Ashraf filed his motion to reopen with ICE. The parties dispute whether the motion was properly filed, but this issue is not relevant to the present case.

On July 22, 2008, approximately one month after the final removal order was issued, Kevin Hardy, another ICE agent, attempted to get Ashraf to complete a Pakistani passport application. But Ashraf again insisted that he was a Kuwaiti citizen and refused to cooperate. Hardy then read to Ashraf verbatim the government's official warning

regarding the consequences of his failing to comply with his obligation to obtain travel documents. Ashraf responded that he understood, but he still refused to assist the government in obtaining the documents necessary for his removal.

He was next visited on September 9, 2008 by Brandon Brown, yet another ICE agent. Ashraf again refused to sign a Pakistani passport application. Brown then served Ashraf with a notice informing him that he would not be released from ICE custody and, once again, with a Form I-229(a), warning Ashraf of the consequences regarding his failure to depart from the country. Ashraf also refused at that meeting to provide his fingerprints for identification purposes on the Form I-229(a).

Finally, Ashraf was visited on October 7, 2008 by James Schubert, an ICE supervisory agent. Ashraf once more refused to sign the travel documents for his return to Pakistan and was again presented with Form I-229(a)'s warning concerning the consequences of his failure to comply. On that date, Schubert obtained Ashraf's fingerprints for identification purposes. Ashraf claims that Schubert took Ashraf's hand and forcibly obtained his fingerprints against his will.

The government in the present case charged Ashraf with four criminal counts arising out of his refusal to assist the government with his removal from the United States. Three of these counts are based on Ashraf's individual interactions with various immigration officers on July 22, September 9, and October 7, 2008 for "willfully fail[ing] or refus[ing] to make [a] timely application in good faith for travel or other documents necessary to [his] departure." 8 U.S.C. § 1253(a)(1)(B). The fourth count alleged that, based on all of Ashraf's actions from June 24, 2008 through November 3, 2008, he "connive[d] or conspire[d], or t[ook] any other action, designed to prevent or hamper or with the purpose of preventing or hampering [his] departure." 8 U.S.C. § 1253(a)(1)(C).

**B.      Proceedings in the district court**

*1.      Evidentiary issues*

Prior to Ashraf's trial for his refusal to sign the travel documents necessary for his departure,  the parties briefed, and the district court ruled on, the admissibility of evidence that Ashraf sought to offer regarding his immigration status and his attempts to reverse his 2003 firearms conviction.  Ashraf also presented an expert witness to testify concerning the complexities of immigration law.  He maintained that such evidence was relevant to show that he neither "connived" to avoid removal nor failed to act in good faith when he refused to obtain travel documents.  The government, on the other hand, argued that such evidence was irrelevant because Ashraf had already been denied habeas relief on his firearms conviction regarding his "claim to legal immigration status in the United States at the time of his firearm arrest."  And even if this evidence was moderately relevant, the government contended that its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, the potential to mislead the jury, and by considerations of undue delay.

The district court ruled that Ashraf was "precluded from introducing evidence that relates to his firearms conviction [including] evidence of his attempts to file his forms I-485 [applications for permanent residence], his impression as to his legal resident status or lack of same, and any evidence as to his beliefs about those issues at the time he refused to sign the paperwork at issue in this case."  Such evidence was deemed inadmissible because "[t]he firearms conviction has been adjudicated to its conclusion" and could not therefore be relitigated in the present case.  Moreover, even though the court acknowledged Ashraf's belief that he had "been dealt a wrong by immigration authorities" before his removal process, these matters were not at issue here because the court was constrained by this court's precedent and by 8 U.S.C. § 1227(a)(2)(c) "to accept the final removal order and the conviction giving rise to it."

The district court also ruled that the probative value of such evidence would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and the potential to mislead the jury.  Ashraf's proposed expert was thus limited to testifying

about the events that gave rise to Ashraf's present conviction, and was not permitted to testify regarding Ashraf's prior immigration issues or about the February 2009 denial of his second application for permanent residence.

Nonetheless, Ashraf was permitted to discuss other background matters, as well as the circumstances relating to ICE's requests for him to sign the travel forms related to his removal. But he could not discuss his interactions with the Immigration and Naturalization Service (INS) (now part of the Department of Homeland Security (DHS)) or ICE that occurred before he was asked to sign the forms. Despite these evidentiary rulings, the district court ended up allowing a significant amount of testimony concerning Ashraf's immigration status, in part because the government opened the door to such testimony.

### 2.        *Ashraf's trial for refusing to obtain travel documents*

In March 2009, Ashraf was tried on the four counts arising out of ICE's various attempts to obtain his assistance regarding his travel documents. After both parties rested, but before closing arguments, Ashraf moved for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The district court overruled his motion.

Ashraf was convicted on two counts and acquitted on two counts. The jury convicted him of willfully failing to obtain travel documents in connection with his July 2008 meeting with Hardy and his October 2008 meeting with Schubert, but acquitted him of this same charge concerning his September 2008 meeting with Brown. He was also acquitted of knowingly conniving or taking any other action for the purpose of preventing or hampering his departure.

In July 2009, Ashraf moved for a new trial based on evidence that he acquired in May 2009 pursuant to a Freedom of Information Act (FOIA) request. This evidence consisted of an INS memorandum from 2002 regarding an investigation into Ashraf's immigration status in connection with his firearms conviction. The memorandum contained the opinion of an immigration officer that an application for permanent residency that Ashraf had filed in 1997 should have been granted. Ashraf argued that

this new evidence supported his good-faith belief that he had a defense against his deportation.

The district court disagreed. In addition to concluding that these documents were not newly discovered, the court determined that, even assuming that these documents were newly discovered, they would still not form the basis for a new trial because the evidence contained in them "in no way assists the defendant in asserting any alleged good faith belief that he had a defense to deportation in this matter . . . ."

Ashraf was sentenced in August 2009 to 12 months' imprisonment on each of the two counts for which he was convicted, to be served concurrently, in addition to a 3-year term of supervised release and a $200 special assessment. The district court also ordered that, upon his release from prison, Ashraf would have to surrender to ICE for deportation.

## C.     Ashraf's immigration status and firearms conviction

### 1.     *Ashraf's initial attempt to become a permanent resident*

Although Ashraf's immigration status and his 2003 firearms conviction are not directly at issue in the present case, these matters played a substantial role in his trial and are central to his appeal. This background information is therefore essential to an understanding of the case.

Ashraf entered the United States from Pakistan on an F-1 nonimmigrant student visa in August 1992. In 1997, while still lawfully in the country under his student visa, Ashraf married Monika Taskova, who was a lawful permanent resident, but not a citizen, at the time of their marriage. Ashraf applied to become a permanent resident soon thereafter. In January 2000, while his application was still pending, Ashraf informed the INS of the fact that Taskova had recently become a United States citizen. But, as Karyn Zarlenga (the custodian of Ashraf's alien file at the United States Citizenship and Immigration Services (USCIS)) testified, Ashraf's application for permanent residency was denied in September 2000 because an immigrant visa was not immediately available to Ashraf when he filed his application in 1997. The visa was not immediately available

because Ashraf's wife was not yet a naturalized citizen in 1997, and the category of family-based visas for the spouses of lawful permanent residents was backlogged when Ashraf filed his application for permanent residency.

This meant that Ashraf's 1997 application for permanent residency had no chance of ever being approved because such applications may be granted only if a visa is immediately available when the alien files his or her application. *See* 8 U.S.C. § 1255(a) (requiring an immigrant visa to be immediately available at the time an application for permanent residence is filed in order for the applicant to obtain the requested change in status); 8 C.F.R. § 245.2(a)(2)(i)(A) ("An immigrant visa must be immediately available in order for an alien to properly file an adjustment application under section 245 of the Act."). Ashraf argues that his application should therefore have been denied immediately after it was filed rather than remain pending despite having no chance of being granted. Had his application been promptly denied upon its being filed in 1997, Ashraf contends that he could have filed a new application immediately after his wife became a United States citizen in 2000 rather than waiting for the results of his still-pending 1997 application.

The INS mailed its notice denying Ashraf's application to the original address that it had on file for him, but he and Taskova no longer lived at this address. In ruling on Ashraf's habeas petition regarding his 2003 firearms conviction, the district court for the Southern District of Florida found, consistent with Ashraf's claim in the present case, that he had previously notified the INS of his address change. *Ashraf v. United States*, No. 05 Civ. 80420, at 11 (S.D. Fla. Nov. 30, 2005). Zarlenga, on the other hand, testified in the present case that Ashraf's file contained a discrepancy regarding his zip code, but she did not recall any change of address in his file.

### 2.    *The 2003 firearms conviction*

On October 17, 2001, agents from the Federal Bureau of Investigation (FBI) conducted a consensual search of Ashraf's home and car based on a tip from one of Ashraf's neighbors that Ashraf possessed firearms and ammunition. *See Ashraf*, No. 05 Civ. 80420, at 19-20. The agents discovered a number of firearms and several thousand

rounds of ammunition.   *Id.* at 8-9.   Although nonpermanent lawful residents are prohibited from possessing firearms, Ashraf was not arrested at the time because of confusion on the part of law-enforcement officers regarding his immigration status.

The INS report obtained as a result of Ashraf's May 2009 FOIA request shows that Ashraf was not taken into custody when the firearms were seized from his home because an immigration officer opined that his application for permanent residency should have been granted due to Ashraf's wife being a United States citizen.  This report also shows that an immigration officer advised Ashraf around that time to refile his application for permanent residency.

Ashraf claims that because the notice regarding the denial of his application for permanent residency was sent to the incorrect address in the year 2000, he did not find out that his application was denied until the FBI agents searched his home in October 2001.  He submitted a new application for permanent residency approximately two weeks after the search.  This application was not denied until February 2009, after Ashraf had already been indicted in the present case.

While Ashraf's second application for permanent residency was pending, he was arrested and indicted in September 2002, pursuant to 18 U.S.C. § 922(g)(5)(B), for being a nonimmigrant alien in possession of firearms or ammunition based on the 2001 seizure of weapons and ammunition from his home and car.  *Ashraf*, No. 05 Civ. 80420, at 2. He was convicted by a jury and sentenced by the district court for the Southern District of Florida to 78 months' imprisonment, to be followed by 3 years of supervised release. Ashraf served the sentence for his firearms conviction at various federal prison facilities, finishing his time at a facility in Youngstown, Ohio in May 2008.

His firearms conviction and sentence were upheld by the United States Court of Appeals for the Eleventh Circuit.  Ashraf was denied postconviction relief under 28 U.S.C. § 2255.  Then, in January 2007, Ashraf filed a successive petition for habeas relief with the district court for the Northern District of Ohio (based on his detention at the time in Ohio), pursuant to 28 U.S.C. § 2241, arguing that he was "actually innocent because he was a legal immigrant rather than a non-immigrant alien at the time of his

arrest." *See Ashraf v. Tapia et al.*, No. 07-3700, at 2 (6th Cir. June 12, 2008) (unpublished opinion). Both the district court and this court denied his successive petition because "[t]he testimony of the government agents, along with Ashraf's immigration documents, clearly showed that Ashraf had not attained permanent resident status when he was arrested and the firearms were seized, contrary to Ashraf's argument." *Id.* at 3.

The present appeal is limited to Ashraf's conviction for his willful failure to obtain travel documents, and does not include his prior firearms conviction or the adjudication of his immigration status. But Ashraf raises these background issues in order to show that he had a good-faith basis for refusing to sign the travel documents at issue in the present case. The details surrounding his applications for permanent residency and his firearms conviction are therefore before us only insofar as they pertain to Ashraf's present appeal.

**D.      Ashraf's current status**

Ashraf has now completed both his 78-month prison sentence for the firearms conviction and his 12-month prison sentence for the instant conviction. He was released on October 28, 2009. On August 25, 2010, he filed an emergency motion in this case to stay his removal because of his pending appeal and an alleged "understanding with other agencies of the federal government who desire Mr. Ashraf's assistance in matters of national security." He was deported to Pakistan the following day. On September 2, 2010, this court denied his emergency motion for a stay of removal because Ashraf failed to demonstrate that he had "any means to challenge the removal order or any likelihood of success in having that order overturned." *United States v. Ashraf*, No. 09-4002, at 2 (6th Cir. Sept. 2, 2010).

The government filed a motion shortly thereafter to dismiss this appeal as moot because Ashraf has been deported and is barred from reentering the country because of his earlier firearms conviction. Ashraf nevertheless continues to challenge his conviction for willfully failing to obtain travel documents because he claims that this conviction might affect his ability to return to the United States in the future.

## II.  ANALYSIS

**A.     Alleged mootness based on Ashraf's removal from the country**

The government argues in its motion to dismiss this appeal that Ashraf's claims are moot because he has already been removed from the country and, even if his conviction for willfully failing to obtain travel documents were to be reversed, he would still not be permitted to reenter because of his earlier firearms conviction.  Ashraf, on the other hand, argues that his current appeal is not moot because"[h]is chances to obtain a waiver of inadmissibility with the Attorney General would certainly be enhanced if he is able to reverse the wrongful convictions reached in the instant matter."  He also disputes his future inability to return based on his firearms conviction because he raises arguments that he believes should result in the reversal of that conviction.

Ashraf correctly points out that a defendant is presumed to suffer collateral consequences from a conviction even after the sentence has expired.  *See Spencer v. Kemma*, 523 U.S. 1, 12-13 (1998).  Although the Supreme Court in *Spencer* declined to extend this presumption beyond challenges to convictions, such as to parole revocations, the Court left the presumption intact where a defendant seeks to overturn a conviction because of the "obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences."  *Id.* at 12 (quoting  *Sibron v. New York*, 392 U.S. 40, 55 (1968)).  This court has also noted that, in recent decades, the Supreme Court has "allowed federal courts to presume the existence of collateral consequences."  *Gentry v. Deuth*, 456 F.3d 687, 694-95 (6th Cir. 2006) (holding, based on *Spencer*, 523 U.S. at 8, that the petitioner could bring a habeas corpus petition challenging her state-court conviction for driving under the influence and for manslaughter even though she had already been released from prison).

The government responds by citing *United States v. Rosenbaum-Alanis*, 483 F.3d 381 (5th Cir. 2007), for the proposition that where aliens are deported and legally prevented from reentering the country, their challenges to criminal proceedings that would not alter their inability to reenter are moot.  *Id.* at 383 ("Because the defendant has

been deported to the Republic of Mexico and is legally unable, without permission of the Attorney General, to reenter the United States to be present for a resentencing proceeding as required by Rule 43, there is no relief we are able to grant him and his appeal is moot."). But the present case is distinguishable from *Rosenbaum-Alanis* because the defendant there challenged only the length of his sentence, not his conviction. *See Gentry*, 456 F.3d at 694 (pointing out that the "Commonwealth mistakenly relies on a line of decisions that addresses habeas petitions attacking the *sentence* rather than the *conviction*" (emphasis in original)). The Supreme Court in *Spencer* explicitly distinguished between challenges to convictions and other types of challenges to criminal proceedings. *Spencer*, 523 U.S. at 12. We thus conclude that the decision in *Rosenbaum-Alanis* is not inconsistent with applying *Spencer*'s presumption of collateral consequences to Ashraf's appeal.

Whether our court interprets *Spencer*'s presumption as absolute within the context of challenges to convictions is not entirely clear. But even if one presumes "that the mere presence of the conviction is not, in and of itself, sufficient injury to give rise to a case or controversy, it is equally settled by *Gentry* that a petitioner need not show much more than the possibility of tangible collateral consequences for the burden to shift to the state to show that the consequences are not in fact possible." *Gall v. Scroggy*, 603 F.3d 346, 354 (6th Cir. 2010) (citing *Gentry*, 456 F.3d at 694, and *Spencer*, 523 U.S. at 7). In *Gall*, this court rejected Kentucky's claim that because the petitioner's murder conviction would not affect his parole proceedings until the year 2021, such consequences were too remote to constitute an injury. *Id.* at 354. Ashraf's contention that his conviction might affect the Attorney General's discretionary decision to allow him back in the country similarly satisfies whatever minimal collateral consequence that Ashraf might be required to show in order for this court to retain jurisdiction over his claim. *See* 8 U.S.C. § 1182(a)(9)(A)(ii)(II), (iii) (providing that the statute's prohibition on an alien who is forbidden from reentering the country "at any time" because of an aggravated felony does not apply if "the Attorney General has consented to the alien's reapplying for admission").

This court has relied on a case from one of our sister circuits that recognizes just such an injury as a legitimate collateral consequence. The petitioner in *Chong v. District Director, I.N.S.*, 264 F.3d 378 (3d Cir. 2001), challenged the Board of Immigration Appeals' (BIA's) determination that her aggravated felonies were "particularly serious," even though Chong had already been deported. *Id.* at 382, *cited favorably by Garcia-Flores v. Gonzales*, 477 F.3d 439, 441 n.1 (6th Cir. 2007) (noting that an alien may challenge his or her removal even after being deported because the alien continues to suffer an ongoing injury based on his or her being prevented from seeking reentry for five years after the removal). As in the present case, even if Chong were to prevail, she would still not have been able to return to the United States because her aggravated-felony convictions would have remained on her record. *Chong*, 264 F.3d at 385-86. But the Third Circuit held that Chong's claim was not moot because if the court were to reverse the Board's finding that Chong committed a "particularly serious crime," the "Attorney General could exercise his discretion and grant 'withholding' of removal and allow Chong to reenter the United States." *Id.* We conclude that Ashraf's appeal is analogous and thus not moot. The government's motion to dismiss is therefore denied.

**B.      The district court's denial of Ashraf's motion for a judgment of acquittal**

We now turn to the merits of Ashraf's appeal. The district court's denial of Ashraf's motion for a judgment of acquittal is reviewed by us de novo, and we "must affirm the district court's decision if the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt." *United States v. Mabry*, 518 F.3d 442, 447-48 (6th Cir. 2008) (brackets and citation omitted). In conducting this review, we give "the government the benefit of all inferences that could reasonably be drawn from the testimony." *United States v. Villarce*, 323 F.3d 435, 438 (6th Cir. 2003) (citation omitted). Ashraf puts forth two arguments as to why there was insufficient evidence to convict him of willfully failing to obtain the travel documents necessary for his removal from the United States.

### 1.       *Inconsistent jury verdicts*

His first argument is that the jury's "split verdict" on similar counts "necessarily means that the jury rejected the government's theory" that Ashraf willfully refused to obtain the travel documents.  Three of the four counts against Ashraf accused him, under 8 U.S.C. § 1253(a)(1)(B), of willfully failing to make a timely application in good faith for travel documents based on individual meetings that he had with three different ICE agents.  The jury convicted Ashraf on counts two and four (corresponding, respectively, to his July 22, 2008 meeting with ICE agent Kevin Hardy and his October 7, 2008 meeting with ICE agent James Schubert), but acquitted him on count three (which was based on his September 9, 2008 meeting with ICE agent Brandon Brown).

The government correctly argues, however, that even if these three incidents were substantially similar as far as the charges against Ashraf are concerned, the jury's disparate verdicts on these counts do not render the two guilty verdicts invalid.  As the Supreme Court held in *United States v. Powell*, 469 U.S. 57 (1984), "there is no reason to vacate [the] respondent's conviction merely because the verdicts cannot rationally be reconciled."  *Id.* at 69 (rejecting lower court decisions holding that "an acquittal on the predicate felony necessarily indicated that there was insufficient evidence to support the" conviction at issue).

> This court has reasoned that a
>
> jury that inconsistently convicts [a] defendant of one offense and acquits him of another is as likely to have erred in acquitting him of the one as in convicting him of the other.  Juries are permitted to acquit out of compassion or compromise or because of their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.

*United States v. Lawrence*, 555 F.3d 254, 261-62 (6th Cir. 2009) (setting aside the district court's reversal of the jury's death sentence where the jury imposed a life sentence on another count arising out of the same incident) (citation and internal quotation marks omitted).  Inconsistent verdicts are not generally a reason for overturning a conviction because "a criminal defendant already is  afforded protection

against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." *Powell*, 469 U.S. at 67; *see also United States v. Ruiz*, 386 F. App'x 530, 533 (6th Cir. 2010) (holding that "a defendant's protection against an inconsistent verdict lies in an independent review of the sufficiency of the evidence" (citing *Powell*, 496 U.S. at 67)).

Both *Lawrence* and *Ruiz* recognize limited exceptions to the rule that "inconsistent verdicts are generally held not to be reviewable." *Lawrence*, 555 F.3d at 262. These exceptions, however, are not applicable to the present case. *Lawrence* holds that "it is only when jury verdicts are marked by such inconsistency as to indicate arbitrariness or irrationality that relief may be warranted." *Id.* at 263 (emphasis omitted). Because the counts at issue in the present case deal with three wholly separate incidents, there is simply no way to know for sure what motivated the jury's allegedly inconsistent verdicts regarding these counts. As was the case in *Lawrence*, "[t]o the extent the differences in the jurors' . . . findings remain unexplained and may give rise to speculation, the fact remains that there is no evidence that any arbitrary factor 'most likely' influenced the bottom line verdicts." *Id.* at 268 (citation omitted).

The exception in *Ruiz* is also inapplicable because it applies where the two counts at issue are mutually exclusive. *Ruiz*, 386 F. App'x at 533 (holding that even if two counts are interdependent, as long as they are not mutually exclusive, inconsistent jury verdicts should not be overturned). Because the three counts that Ashraf claims are inconsistent are based on wholly separate visits by different ICE agents, thus allowing for the possibility that he was guilty on less than all of these counts, *Ruiz*'s exception does not apply in the present case. Ashraf is therefore not entitled to an acquittal based on the jury's divergent verdicts.

### 2.     *Ashraf's alleged good-faith refusal to obtain travel documents*

Ashraf's second argument regarding his motion for a judgment of acquittal is that his efforts "to challenge his removal were reasonable in light of the manner he was treated by immigration authorities." Although he is "not suggest[ing] that [he] should win on the merits regarding his immigration claims," he argues that because he "act[ed]

in good faith in seeking the remedies he seeks, the jury was precluded by the 'proper steps' and 'good faith' definitions given to them by the Court from convicting Mr. Ashraf on any count alleged in the indictment."

### a.    The good-faith and proper-steps elements of 8 U.S.C. § 1253

Ashraf misinterprets the good-faith and proper-steps prongs that are contained in 8 U.S.C. § 1253. As the district court correctly stated during a hearing concerning the proposed jury instructions, the government need not prove that Ashraf "failed to act in good faith when he failed to execute the travel documents. The government is required to prove that he acted willfully. . . . Congress intended that the application itself had to be in good faith . . . rather than [that the] refusal could be in good faith." An examination of the plain text of the statute and the overall statutory scheme regarding the removal of aliens makes clear that Ashraf's proposed good-faith exception does not exist. *See United States v. Adeyinka*, 205 F. App'x 238, 241 (5th Cir. 2006) ("The statute's good faith exception does not apply to those who willfully and knowingly violate its terms. The good faith language simply applies to those who try to comply with the statute in 'good faith' but nevertheless fail to obtain documents in a timely manner.").

Moreover, the provision in 8 U.S.C. § 1253(a)(2) that relieves an alien from liability for taking "any proper steps for the purpose of securing cancellation of or exemption from such order of removal" is intended to prevent the alien from being prosecuted on the basis of his or her attempts to contest removal. *Adeyinka*, 205 F. App'x at 241 (holding that the proper-steps exception "is intended to prevent the government from prosecuting an alien who challenges deportation. This exception does not apply to Adeyinka because by refusing to sign the documents, Adeyinka was not challenging his deportation."). The provision, therefore, does not exempt an alien from his or her obligation to apply in good faith for the documents necessary for departure.

Ashraf criticizes the government's reliance on *Adeyinka* because it is an unreported decision from another circuit, but he cites no authority in support of his own interpretation of the statute. Moreover, *Adeyinka*'s interpretation of 8 U.S.C. § 1253

appears to us as the most logical reading of the statutory text. The United States Code provides aliens subject to removal proceedings with specific instructions on how to contest their removal, such as 8 U.S.C. § 1252's provisions for judicial review of removal orders. In contrast, 8 U.S.C. § 1253, the statutory section at issue in the present case, imposes certain obligations on aliens facing removal. Although aliens may contest their removal pursuant to 8 U.S.C. § 1252, such efforts do not abrogate the obligations imposed by 8 U.S.C. § 1253. *See Adeyinka*, 205 F. App'x at 241.

Section 1253's proper-steps exception, in other words, prevents Ashraf's efforts to challenge his removal from being used as evidence of his failure to obtain his travel documents. But by the same token, his attempts to have his removal reversed do not excuse him from his statutory obligation to make a good-faith effort to obtain travel documents at the request of the ICE agents. And the jury was properly instructed according to these legal principles.

Ashraf's complaints concerning how the government dealt with his immigration issues are simply not relevant to the present appeal. In fact, he acknowledges that "[i]t is not suggested that Mr. Ashraf should win on the merits regarding his immigration claims." Ashraf instead limits his argument to the claim that his subjective beliefs about the purported invalidity of his removal provided him with a good-faith basis for refusing to assist the government in obtaining the documents that were necessary for his removal. But as the district court explained, "I'm not insensitive to the fact the defendant believes he has been dealt a wrong by immigration authorities, however, any wrongs that may or may not have occurred prior to the issuance of the final order of removal, or final removal order, are not at issue here."

> **b.** **The substance of Ashraf's alleged good faith based on his immigration status and firearms conviction**

In addition to Ashraf's proposed good-faith exception having no legal basis, his argument fails for lack of factual merit because he had no legitimate reason to believe that he was a permanent resident when his firearms were seized. Even the 2002 INS memorandum, which Ashraf argues would support a new *Brady* claim regarding his

firearms conviction, does not provide evidence of his alleged good-faith belief because the memorandum in no way suggests that his application for permanent residence had been granted. The memorandum simply reveals that an immigration officer thought that Ashraf's application for permanent residency should have been granted, which clearly indicates that this change of status had not yet occurred. According to the INS memorandum, Ashraf was also told that he should refile his application for permanent residency, further indicating that he was not a permanent resident at that point in time.

Ashraf therefore did not have a good-faith reason to believe that he could lawfully possess either firearms or ammunition when his house was searched in 2001. This deprives him of any legitimate basis to contest his firearms conviction or his subsequent removal that was predicated on the conviction. Furthermore, this court denied Ashraf's emergency motion to stay his removal because he failed to demonstrate that he had "any means to challenge the removal order or any likelihood of success in having that order overturned." *United States v. Ashraf*, No. 09-4002, at 2 (6th Cir. Sept. 2, 2010).

The district court also properly ruled that Ashraf cannot relitigate his firearms conviction in the present case. Ashraf's conviction, which has already been affirmed on both direct and collateral appeal, is not subject to further review here. *See, e.g.*, *Al-Najar v. Mukasey*, 515 F.3d 708, 714 (6th Cir. 2008) (holding that an alien petitioner may not challenge his or her removal by "collaterally attack[ing] a criminal conviction that serves as the basis for the DHS's initiation of removal proceedings against the alien, regardless of whether the attack is raised in a habeas petition or, as it is here, on review from a decision of the BIA"). Moreover, even if Ashraf were allowed to separately challenge his firearms conviction through yet another successive habeas petition based on his alleged actual innocence in light of the newly discovered INS memorandum, such a claim would fail because, as explained above, this new evidence does not suggest that Ashraf had any reason to believe that he was a permanent resident when his firearms were seized in October 2001.

Nor does Ashraf's mistaken belief that he was served with a final order of removal in May 2008—rather than with a preliminary notice of the government's intent to remove him—help his case. Even if such a belief were relevant to his claims, both of the individual incidents that gave rise to Ashraf's conviction in the present case occurred after his removal order was in fact final. He was thus under no misimpression regarding the status of the removal order at the time of the events that led to his conviction for willfully failing to sign travel documents.

In sum, the government presented significant evidence on all of the elements of an 8 U.S.C. § 1253(a)(1)(B) offense: (1) that a final order of removal was outstanding against Ashraf; (2) that he was deportable under 8 U.S.C. § 1227(a); and (3) that Ashraf willfully failed or refused to make a timely application in good faith for travel or other documents necessary for his departure. The district court therefore did not abuse its discretion in denying his motion for a judgment of acquittal.

## C.     Evidentiary rulings

Finally, Ashraf argues that the district court improperly excluded evidence that he proffered at trial. We review that court's evidentiary rulings under the abuse-of-discretion standard. *United States v. Hart*, 70 F.3d 854, 858 (6th Cir. 1995). "This deferential standard of review applies to a district court's determinations of the relevance of evidence under Rule 401, as well as determinations under Rule 403 that the prejudicial value of evidence outweighs its probative value." *Id.* (citations omitted). District courts have broad latitude in deciding whether to admit expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Such decisions are similarly reviewed under the abuse-of-discretion standard. *United States v. Langan*, 263 F.3d 613, 620 (6th Cir. 2001).

Ashraf argues that the details of his interactions with the various immigration agencies, his applications for permanent residency, and his asserted defenses to his firearms conviction form the basis of his defense against the mens rea element of the charges against him. He also contends that the government "partially opened the door to the prohibited evidence" when it elicited testimony from USCIS agent Zarlenga about

Ashraf's immigration history "pre-dating the alleged offense conduct in the indictment in the instant case." Although the district court agreed that the government partially opened the door and therefore allowed cross-examination regarding "[m]ost of the circumstances surrounding" the denial of Ashraf's first application for permanent residence, the court "still denied questioning of Ms. Zarlenga concerning whether or not Mr. Ashraf had a right to appeal the February 9, 2009, denial of Mr. Ashraf's application for permanent residency."

The district court did not abuse its discretion in excluding evidence regarding Ashraf's immigration status and his firearms conviction. It correctly ruled as a matter of law that there is no good-faith defense to Ashraf's willful failure to obtain the documents that were necessary for his departure, and that Ashraf's attempts to contest his removal did not obviate his obligation to obtain such documents. The circumstances surrounding Ashraf's immigration status were thus irrelevant to whether he complied with 8 U.S.C. § 1253(a)(1)(B)'s requirements. Moreover, Ashraf acknowledges that the district court ended up permitting cross-examination on most of these issues because the government opened the door to them. As the government points out in its brief, there were also a number of other instances at trial where the court allowed testimony or discussion of these issues.

Ashraf further argues that the facts surrounding his firearms conviction should have been considered insofar as they establish that he had a good-faith basis for refusing to sign his travel documents. But because there is no good-faith exception for his failure, the details surrounding his firearms conviction are not relevant to whether he willfully refused the ICE agents' repeated requests to sign. Moreover, Ashraf has offered no evidence showing that he had reason to believe that he was a permanent resident when the firearms were seized from his home in 2001. The district court therefore did not abuse its discretion in determining that these matters should be excluded because they are irrelevant to the present case and because their introduction could have confused the jury.

Ashraf finally contends that his proposed expert should not have been precluded from testifying about "how a person in Mr. Ashraf's position might reasonably believe he had a remedy against his removal." Because this alleged reasonable belief is irrelevant to whether Ashraf was guilty of the charges against him, however, the district court did not abuse its discretion in deciding that Ashraf's expert could not testify about the legal complexity of the very same issues that the court had already excluded as irrelevant or confusing. *See Daubert*, 509 U.S. at 591 (explaining that the subject matter of an expert's testimony must be relevant to the case).

## III. CONCLUSION

For all of the reasons set forth above, we **DENY** the government's motion to dismiss and **AFFIRM** the judgment of the district court.