NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0236n.06

No. 13-5257

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Mar 28, 2014 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| YENNIER CAPOTE GONZALEZ | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

Before: KEITH, COOK, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. A jury convicted Yennier Capote Gonzalez of five counts of health care fraud in violation of 18 U.S.C. § 1347, one count of money laundering in violation of 18 U.S.C. § 1957, and two counts of aggravated identity theft in violation of 18 U.S.C. § 1028A. The district court sentenced him to 67 months' imprisonment. Gonzalez appeals his convictions and sentence on many grounds, most of which are meritless. The exception is his challenge to the sufficiency of the evidence supporting his convictions for aggravated identity theft, as to which the government presented little evidence at trial, and few arguments on appeal. We affirm Gonzalez's convictions for health care fraud and money laundering, reverse his convictions for aggravated identity theft, and remand the case for resentencing.

I.

Yennier Capote Gonzalez lived in Miami. He bought a tract of land at 140 Lonesome Point Lane in Jackson County, Tennessee. The tract had an unfinished house on it. Gonzalez also bought a nearby tract of land at 179 Buck Branch Lane, which included a run-down barn. Gonzalez later defaulted on the mortgages for each of the Jackson County properties. The lender foreclosed and sold the properties at auction in June 2010. Thereafter Gonzalez had no legal interest in the properties.

That same month, however, Gonzalez submitted a Tennessee corporate charter for Gainesboro Ultimate Med Service Corporation, which listed Gainesboro Med's mailing address as 179 Buck Branch Lane. The charter also listed the same address for Gonzalez, and listed him as Gainesboro Med's president. On July 1, Gainesboro Med applied for a national provider identification (NPI) number, which are unique identifiers issued by the Centers for Medicare and Medicaid Services to healthcare providers such as doctors and medical clinics. This application listed Gainesboro Med's address at 179 Buck Branch Lane and its authorized official as Gonzalez. Weeks later, Gonzalez obtained a business license from Jackson County, Tennessee, to operate Gainesboro Med as an "online medical billing" company. Once again, Gainesboro Med's listed address was 179 Buck Branch Lane.

On July 13, Manuel Trujillo sent a text message to cellphone number (305) 420-8152. The text contained only the name "Tidence Prince, M.D." and an NPI number. Two days later, Trujillo sent a series of text messages to the same phone number that contained the names Orlando Martinez, Jorge Valdez, Monica Rodriguez, and Rosemary Mir.

On July 16, Gonzalez opened a business-checking account for Gainesboro Med with Regions Bank in Cookeville, Tennessee. He listed Gainesboro Med's address as 179 Buck

Branch Lane and made himself the account's only authorized signatory. Gonzalez also listed his phone number as (305) 420-8152—the number for the cellphone that had received the text messages on July 13 and 15.

Over the next few weeks, Gainesboro Med submitted several online claims to two different insurance companies, Wellpoint and Cigna. Gainesboro Med sought reimbursement for injections that were purportedly administered to the persons listed in the July 15 text messages: Orlando Martinez, Jorge Valdez, Monica Rodriguez, and Rosemary Mir. Each claim included Dr. Prince's NPI number and listed him as the physician who administered the injections. In fact, however, most of the patients were fictitious and none of the injections were performed.

On August 12, Cigna mailed to 179 Buck Branch Lane a $38,116 check payable to Gainesboro Med for medical services purportedly provided to Rosemary Mir and Monica Rodriguez. Five days later, Gainesboro Med deposited that check into its checking account at Regions Bank in Cookesville, Tennessee. The check constituted essentially all of the funds in Gainesboro Med's account. Two days later, Gonzalez (the account's only signatory) wrote a check to Manuel Trujillo for $2000 and another check in the same amount to himself, which he deposited in his personal account. On August 23, Gonzalez visited a Regions Bank in Miami and obtained a $14,400 cashier's check, payable to his landlord, drawn from the Cigna funds in the Gainesboro account. He also tried to wire Trujillo the remaining $17,000 from the Regions account, but the bank refused because the funds had been deposited too recently.

Meanwhile, Cigna reported Gainesboro Med as a suspicious provider to Special Agent Robert Turner at the Department of Health and Human Services. Turner investigated, first by visiting 179 Buck Branch Lane. There he found only a barn and a mailbox, which contained mail addressed to Gainesboro Med.

Turner also learned that the patients whom Gainesboro Med supposedly had treated resided at 140 Lonesome Point Lane. He drove there and found only a mailbox and the unfinished house, which consisted of a foundation, walls, and a cover for a roof. The mailbox contained mail from Wellpoint and Cigna.

On August 24, Turner called Carol Sawaya, a manager at Region Bank's Miami office, and explained that he was investigating Gainesboro Med and Gonzalez. With Sawaya's assistance, Turner then coordinated a plan to arrest Gonzalez at the bank. The next day, a Region's employee called Gonzalez and told him that his $17,000 wire transfer had been approved and that he needed to come into the bank. Gonzalez did so and gave Sawaya his driver's license and bank card. Then Turner arrested him.

A jury thereafter convicted Gonzalez of five counts of health care fraud in violation of 18 U.S.C. § 1347, one count of money laundering in violation of 18 U.S.C. § 1957, and two counts of aggravated identity theft in violation of 18 U.S.C. § 1028A. Gonzalez filed a motion for judgment of acquittal or new trial, which the district court denied. The court sentenced Gonzalez to 67 months' imprisonment. This appeal followed.

II.

A.

Gonzalez challenges two of the district court's evidentiary decisions.

1.

Gonzalez argues that the government violated his Fourth Amendment right to be free from unreasonable searches when it obtained the July 13 and 15 text messages from the phone company without a warrant. The phone number that received the messages was the same one that Gonzalez had listed as his contact number when he opened a Regions Bank account for

Gainesboro Med. In fact, however, that phone number was assigned to an account registered to someone else. The district court denied Gonzalez's motion to exclude on the grounds that he lacked standing to challenge the admission of text messages retrieved from a phone account that was registered to someone else.

To establish standing for the purposes of the Fourth Amendment, Gonzalez must show, first, that "he had an actual, subjective expectation of privacy" in the text messages; and second, that his expectation was "objectively reasonable." *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001). Reasonable expectations of privacy arise from "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *United States v. Jones*, 132 S. Ct. 945, 951 (2012) (internal quotations omitted). We review the district court's findings of fact for clear error and its legal conclusions de novo. *Smith*, 263 F.3d at 582.

Gonzalez has made virtually no effort to carry his burden here. He offers merely the conclusory assertion that "[c]learly [he] had a legitimate expectation of privacy in his telephone and telephone records." But the phone account in fact was not "his," and he made no effort to show that he exercised any control over the account (which belonged to someone else) from which the text messages were obtained. Thus, whatever the particular standard might be for establishing standing for purposes of contesting the government's retrieval of records from a cellphone account, Gonzalez has not met it here.

Gonzalez alternatively argues the text messages were inadmissible hearsay under Federal Rule of Evidence 802. At trial, the government argued that the messages were offered not for the truth of the matter asserted, but rather to show "that the defendant or this particular phone received these text messages[.]" The district court agreed and denied Gonzalez's motion to

exclude. We review de novo the court's determination that the text messages were not hearsay. *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009).

A "statement offered as evidence of the bare fact that it was said, rather than for its truth, is not hearsay." *Rodriguez-Lopez*, 565 F.3d at 314. Here, the government "[did not] care whether the written texts [were] true or untrue." (R. 156 at 23). Instead, the government sought to introduce the text messages because they supported an inference that Gonzalez was involved in healthcare fraud and identity theft. Moreover, those inferences "do[] not depend on the [sender's] truthfulness, memory, or perception—the core credibility concerns that lie behind the hearsay rule." *Id*. at 315. Thus, the messages were not hearsay, and the district court did not err when it admitted them.

2.

Gonzalez also argues that the district court erred when it granted the government's pretrial motion to exclude certain documents. We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Ashraf*, 628 F.3d 813, 826 (6th Cir. 2011). The excluded documents fall into four categories: (1) "Subpoena Reports" for OLOFIN Inc. (a company apparently owned by Trujillo), dating back nearly a year before the scheme began; (2) Florida corporate records for seven other companies that Trujillo owned; (3) telephone-subscriber information and calling records for Trujillo and another phone number not related to the indictment; and (4) a motion for a protective order in an unrelated Florida civil case. Gonzalez contends that these documents were relevant to his theory that he was a pawn in Trujillo's fraudulent schemes and thus lacked the knowledge and intent required for the charged offenses.

Specifically, Gonzalez offered the documents because, he says, they demonstrate that Trujillo was the mastermind of the scheme at issue here. But the "Subpoena Reports," corporate records, and the Florida court motion date back to the years prior to the scheme, and concern corporations or persons not charged in the indictment. Nor are they related to any of the transactions alleged in the indictment. Similarly, the phone records offered by Gonzalez show only the subscriber information, and the times and durations of outgoing and incoming calls between Trujillo and a telephone number not involved in this case. We therefore agree with the district court that these documents were irrelevant.

B.

Gonzalez next challenges the sufficiency of the evidence supporting each of his convictions—five counts of healthcare fraud, one count of money laundering, and two counts of aggravated identity theft. We can reverse only if no "rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

1.

To convict Gonzalez of healthcare fraud in violation of 18 U.S.C. § 1347, the government must prove that he "(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud." *United States v. Jones*, 641 F.3d 706, 710 (6th Cir. 2011) (citation omitted). Gonzalez concedes that someone submitted the fraudulent claims on behalf of Gainesboro Med—the company he founded and owned—but argues that there is no proof that he was that person.

Circumstantial evidence alone can sustain a guilty verdict. *United States v. Martinez*, 588 F.3d 301, 314 (6th Cir. 2009). And there was plenty of circumstantial evidence here. Gonzalez founded and owned Gainesboro Med. The phone number that he listed as his contact number at Regions Bank received a text message with Dr. Prince's name and NPI number. That phone number received other messages with names of fictitious patients used to file the fraudulent claims. Gainesboro's fake medical clinic—where the fraudulent medical services supposedly took place—was located in a run-down barn that Gonzalez previously owned. The fictitious patients supposedly lived at an unfinished house that Gonzalez also previously owned. The $38,116 check that Cigna issued for one of the fraudulent claims was deposited into Gainesboro's bank account—for which Gonzalez was the only signatory. Gonzalez spent over $16,000 of that money. The jury could have easily inferred from this evidence that Gonzalez filed the fraudulent claims.

Based upon that same evidence, the jury had ample reason to find that Gonzalez knew about the scheme and intended to defraud a healthcare benefits program. *See United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007). Sufficient evidence supports his convictions for healthcare fraud.

### 2.

Gonzalez next challenges the sufficiency of the evidence for his money-laundering convictions in violation of 18 U.S.C. § 1957. Section 1957 requires, among other things, that Gonzalez "knowingly" engaged in a monetary transaction involving "criminally derived property of a value greater than $10,000" that was "derived from specified unlawful activity." *United States v. Bazazpour*, 690 F.3d 796, 801 (6th Cir. 2012) (quoting 18 U.S.C. § 1957). Gonzalez undisputedly withdrew $14,400 of the $38,116 Cigna check to pay his landlord.

Gonzalez's argument as to this conviction is derivative of the argument we just rejected: Gonzalez says that the jury lacked evidence to find that he knew that the Cigna funds were criminally derived. We reject this argument for the same reasons as stated above.

3.

More serious is Gonzalez's challenge to his conviction for aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). To convict Gonzalez of that charge, the government was required to prove that he "knew that the means of identification at issue belonged to another person." *Flores-Figueroa v. United States*, 556 U.S. 646, 657 (2009). Here, the means of identification at issue was Dr. Prince's NPI number. Thus, for Gonzalez's conviction to stand, the government must have proved that Gonzalez knew that Prince was a real person.

The government's proofs on this issue were sparse. The government concedes that it has no direct evidence that Gonzalez knew that Prince was a real person, and that the only information that Gonzalez received about Prince was the July 13 text message that contained Prince's name along with an NPI number. But the government argues that the jury could infer that Gonzalez knew that Dr. Prince was a real person nonetheless. The government summarizes its argument as follows:

> [D]efendant created the corporation Gainesboro Ultimate Med Service by filing for a corporate charter for on June 29, 2010. Later in July, 2010, he applied for a business license for Gainesboro Med. (R. 156, TTR I, Page ID# 750-752, 767-769). The defendant's actions, while setting up the corporation, demonstrate that defendant had knowledge that Gainesboro Med had to be a real corporation in order to receive an NPI number. He knew he could not merely fill in the name of a corporation on the NPI application without the appropriate documentation to substantiate the existence of the corporation. From this, a jury could reasonably infer that defendant knew that the doctor's name and NPI number provided on the claim forms must be that of a real person.

Thus, in essence, the government argues that Gonzalez's own experience in obtaining an NPI number for Gainesboro Med shows that Gonzalez knew that Dr. Prince could have obtained

an NPI number only if he was a real person. But that inference is hardly compelling. True, the government presented evidence that the IRS "validates" NPI numbers for "organizations" every six months. But the government did not present any proofs that Gonzalez was aware of those procedures. More to the point, the government did not present evidence that the same or similar procedures existed for validating NPI numbers assigned to doctors—much less that Gonzalez was aware of those procedures. So far as Gonzalez knew—and indeed so far as the record shows here—the possibility remains that a fraudster could obtain an NPI number, at least for a while, for a doctor who is fictitious.

The evidence in this case, therefore, is considerably weaker than the proofs found sufficient in cases involving aggravated identity theft. In one case, the defendant possessed the victim's birth certificate and credit reports, in addition to the Social Security number that was the means of identification used there. *United States v. Valerio*, 676 F.3d 237, 244–45 (1st Cir. 2012). In another case, the defendants possessed credit-card numbers that they were told "had to be used within 24 hours, which the jury could view as notice that the account numbers belonged to the persons listed and might be reported stolen after 24 hours." *United States v. Shifu Lin*, 508 F. App'x 398, 401-02 (6th Cir. 2012). And other courts have held that "a defendant's repeated and successful testing of the authenticity of a victim's identifying information prior to the crime at issue is powerful circumstantial evidence that the defendant knew the identifying information belonged to a real person as opposed to a fictitious one." *United States v. Doe*, 661 F.3d 550, 562-63 (11th Cir. 2011).

We have nothing of the sort here. What we have, by the government's own account, is merely that Gonzalez incorporated Gainesboro Med (itself a shell corporation) in order to obtain an NPI number for it. Even viewing the evidence in the light most favorable to the government,

that fact would not allow a jury to infer, beyond a reasonable doubt, that Gonzalez knew Prince was a real person. We therefore reverse Gonzalez's conviction for aggravated identity theft.

\* \* \*

In light of our decision to reverse Gonzalez's conviction for aggravated identity theft, we do not address his arguments with respect to his sentence.

We reverse Gonzalez's conviction for aggravated identity theft, affirm his other convictions, vacate the sentences, and remand the case for resentencing.