NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0729n.06

No. 10-6394

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Aug 08, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| DONALD REYNOLDS, JR., | ) | EASTERN DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | OPINION |

Before: COOK and STRANCH, Circuit Judges; LAWSON District Judge.[*]

**DAVID M. LAWSON, District Judge**. Defendant Donald Reynolds, Jr., was convicted after a jury trial of one count of conspiracy to distribute and possess with intent to distribute cocaine and marijuana; four counts of possession of a firearm during and in relation to a drug trafficking crime; three counts of possession with intent to distribute cocaine; five counts of conspiracy to commit promotional and concealment money laundering; seventeen counts of structuring financial transactions; and six counts of conspiracy to commit money laundering by engaging in monetary transactions in property derived from drug activity. He appeals his convictions and sentences, raising a variety of issues through counsel and via his *pro se* filings, none of which requires reversal. Therefore, we affirm.

---

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

No. 10-6394
*United States v. Donald Reynolds, Jr.*

## I.

The government indicted the defendant, Donald Reynolds, Jr., on multiple drug, firearm, and money laundering charges, alleging that he was a high-level drug dealer who arranged for the shipment of marijuana and cocaine through the western United States, eventually taking delivery in Tennessee, where he distributed it. Reynolds covered up his activity using a music distribution business as a front, and he conducted many of his transactions in cash amounts slightly less than the $10,000 currency reporting limits. Reynolds was present during several of the drug exchanges, and he generally was armed and equipped his main location with a gun on a tripod device pointed at the door. The government offered ample evidence to back up these allegations. Nonetheless, on appeal, Reynolds challenges the sufficiency of the evidence to support many of the counts of conviction, so we will discuss the trial testimony in some detail.

### A. Trial evidence

Eric Tyler testified that in late 1999 or early 2000, when he visited Knoxville to collect payment for a shipment of marijuana, he met with Donald Reynolds in Chattanooga, where Reynolds gave him money for the marijuana and established a drug-dealing relationship. According to Tyler, Reynolds would provide Tyler with residential addresses to which Tyler could send FedEx shipments of marijuana. Tyler testified that he shipped approximately 150 to 200 pounds of marijuana to Chattanooga in this manner, and that later, he shipped marijuana to Reynolds's parents' address in Knoxville. Tyler stated that he also sent marijuana to hotel rooms that Reynolds would book for this purpose. Tyler testified that between late 1999 and 2003, he shipped between 2,200 and 2,500 pounds of marijuana to Reynolds.

- 2 -

Nathaniel "Nugget" Smith testified that he became familiar with Reynolds because Reynolds was supplying marijuana and Smith was selling it. In summer 2004, Smith testified, he and Reynolds began traveling to Arizona to purchase marijuana for resale in Tennessee. Smith testified that he, Tim Forbes, and Courtney Hensley would pick up marijuana that Reynolds shipped to hotel rooms from Arizona using the procedure established by Tyler. Smith stated that in late 2005, Reynolds began holding concerts to explain the source of revenue that was coming from the marijuana trafficking, but that in 2005 Reynolds did not actually sell any music or promote any rappers. Smith also testified that Reynolds purchased cars and resold them in order to conceal drug proceeds. According to Smith, by 2006 he and Reynolds's other associates were picking up approximately eighty pounds of marijuana a week, and Reynolds used the resulting revenue to purchase cars and motorcycles.

Smith said he was robbed of a package of marijuana in December 2006. As a result, Reynolds traveled from Knoxville to Nashville, carrying a gun. When Reynolds arrived in Nashville, he loaded the gun and unsuccessfully attempted to retrieve the drugs. After that episode, Reynolds and Smith began dealing in cocaine provided by Mexican cartels in the hope of achieving faster returns. Smith testified that once Reynolds began to deal cocaine, Reynolds rigged a gun on a tripod in the basement where the cocaine and money exchanges took place. The gun was pointed at the door to the basement. Reynolds continued to deal in marijuana as well; Smith traveled to Chicago with Reynolds in the summer of 2007 to pick up marijuana and was caught by police. Smith was also caught with nine ounces of cocaine and a quarter of a pound of marijuana in Knoxville in January 2008.

Antonio Santa Cruz testified that he knew Reynolds as "D", that he met Reynolds in the beginning of 2005, and that he supplied Reynolds at least 800 pounds of marijuana in the span of approximately a year and a half. Santa Cruz stated that early in their relationship, he and Reynolds purchased about 40 pounds of marijuana from a supplier in Arizona, who requested a $10,000 down payment. However, Reynolds wired only $9,800 in order to avoid a "red flag" by the bank from a $10,000 transaction. According to Santa Cruz, he ceased supplying Reynolds with marijuana because of an unpaid drug debt of $75,000.

Carlos Betancourt testified that he sold approximately 300 kilograms of cocaine to Reynolds, whom he also knew as "D", between December 2006 and February 2008. The cocaine was supplied to Betancourt by Joshua Correa, who worked for a Mexican drug cartel. Betancourt testified that in December 2006, he met Reynolds at a Hooter's restaurant with the intention of selling Reynolds some cocaine. Instead of giving Betancourt money, Reynolds gave Betancourt two loaded guns in exchange for the cocaine. Later in the relationship, Betancourt began delivering cocaine to Reynolds at his home. Betancourt described Reynolds's loaded gun set up on a tripod in the basement, where the drug deals occurred. The gun was pointed at the door, and Betancourt testified that worried him. Betancourt testified that when he brought Reynolds cocaine, Reynolds did not always immediately pay him, but that Reynolds deposited money into Betancourt's accounts in increments of less than $10,000 in order to avoid "red flags" and reports to the IRS. Betancourt also testified that he became involved in a real estate venture Reynolds was planning in Las Vegas, Nevada.

In March 2008, the police executed a search warrant on a storage unit in Knoxville and found marijuana, firearms, a currency counting machine, and approximately $200,000 in cash. Betancourt

testified the drug cartel with which he was associated owned the storage unit. Jonathan Correa, Joshua Correa's brother, testified that the guns and marijuana found in the storage unit had been brought to Knoxville in the hope of selling them to Reynolds. Joshua Correa testified that the money in the unit was proceeds from sales to Reynolds.

Betancourt testified that while at a party hosted by cartel leaders in Mexico, he became aware that the cartel was looking for a "5.7 gun," which the cartel called a cop killer gun because the bullets could pierce bullet-proof vests. Betancourt stated that he asked Reynolds whether he could procure such a gun, and Reynolds indicated that he could get thirteen of them. According to Betancourt, Reynolds gave him a 5.7 FN Herstal to keep for himself, despite the fact that the cartel wanted the gun. An employee of the Coal Creek Armory testified that Reynolds had purchased two of those guns in February 2008.

Joshua Correa testified that in February 2008, law enforcement seized approximately thirty-four kilograms of cocaine crossing the border from Mexico; approximately four kilograms were destined for Knoxville. Correa testified that he received drugs from Placido Benitez, a member of a Mexican cartel, and that drivers would transport those drugs to various locations in the United States, including Knoxville. Correa stated that he knew Reynolds by his full name and also as "D." Correa testified that he sent Reynolds approximately 240 kilograms of cocaine through Betancourt between late 2006 and early 2008. According to Correa, in late 2006, Reynolds purchased a BMW from him for approximately $58,000.

Alfredo Alvarado testified that he, along with Carlos Betancourt, supplied cocaine to Reynolds, whom he knew as "D". He also testified that he purchased a vehicle from Reynolds to

drive from Knoxville to Dallas, where he transferred the car to Joshua Correa. The government presented testimony from Richard Jones, who stated that he purchased approximately four to six kilograms of cocaine from the defendant between November 2006 and June 2007. The second time he purchased cocaine, Reynolds placed a gun on the table. The government also presented testimony from John Thomas, who stated that he purchased 50 to 100 pounds of marijuana and two kilograms of cocaine from Reynolds and Smith between 2005 and 2007.

Albert Baah testified that he owned a used car lot in Knoxville. Baah stated that Reynolds purchased several vehicles from him, including a Cadillac Escalade, a Yamaha motorcycle, a GMC Denali, a Chevrolet Impala, and an Infiniti. Reynolds purchased the Escalade with cash, and stated that it was being purchased on behalf of Timeless Entertainment, Reynolds's music company. As a result of that purchase, Baah called the police department to report a large cash transaction, and submitted an 8300 form to the Internal Revenue Service. Baah alerted the police to all future purchases by Reynolds, who paid with cash. The total sale price of the vehicles purchased by Reynolds was approximately $250,000. Reynolds purchased an additional Escalade from Baah, but did not pay the entire purchase price. After that transaction, Baah's account was frozen and Baah was informed that the Escalade had been seized in Chicago because it was involved in a drug trafficking crime. Baah reclaimed the vehicle and sold it wholesale. Baah testified that Reynolds asked him to write a cashier's check for $182,000 in exchange for cash, and that after consultation with the police department, Baah decided to write the check. However, after Reynolds failed to come forward with the cash, Baah cancelled the check. Baah also gave Reynolds cashier's checks for $50,000 and $10,000 after receiving $60,000 in cash from Reynolds.

The government called Drug Enforcement Administration agent David Lewis to testify as an expert witness on the practices of narcotics dealers. He testified not on the basis of his own investigation in the case, but instead offered a color commentary on the evidence presented in court. It is difficult to see what he added to the trial, other than possible prejudice to the defendant when he offered his own opinion on Reynolds's guilt, which the fact witnesses themselves amply demonstrated. Lewis opined that the majority of the drug transactions took place in Reynolds's home because that was where he was most comfortable. Lewis stated that this was the largest cocaine investigation that he had seen in his twenty years in Knoxville. Lewis testified about a cash book found at Reynolds's residence, and opined that it was a drug ledger. When discussing the ledger, Lewis offered this opinion: "Then when you add on top of that the defendant's, the cooperating defendants who have testified, they just to me proved without a doubt that what they say was going on was going on. They told you what was going on. Then you have the records to show that they were telling the truth." Trial Tr., Mar. 2, 2010 at 236.

Lewis also discussed Reynolds's use of weapons. He testified that Reynolds brought a gun at the time he sought to retrieve stolen marijuana "in order to retaliate to shoot and to do whatever was necessary to get the drugs back because that was money. That was also reputation for him." *Id*. at 240. Commenting on Reynolds's possession of a gun at his first meeting with Betancourt, Lewis thought the purpose was to protect Reynolds and to provide a gesture of trust by giving it to Betancourt. With respect to the gun in Reynolds's basement, Lewis testified that the purpose was to protect and further Reynolds's gun trafficking by intimidating individuals coming to the basement to deal. Lewis then discussed the "cop killer" gun that Reynolds gave to Betancourt, stated that the

Mexican cartel wanted the gun because they were in a war with Mexican law enforcement and rival gangs, and opined that Reynolds gave the gun to Betancourt to win favor and develop the relationship.

On cross-examination, defense counsel asked Lewis if it was his opinion that Reynolds was a drug dealer, and (of course) Lewis responded "I know that Mr. Reynolds is a drug dealer." *Id*. at 259. When pressed, Lewis stated that this was "not an opinion" but instead was based on his "experience." *Id*. at 260. Later, defense counsel asked whether, in any of the trials in which he had acted as a witness, he had ever come to the opinion that the defendant was not a drug dealer. Trial Tr., Mar. 3, 2010 at 20. Lewis responded "I wouldn't have testified in the case, if I thought that the defendant was not a drug dealer." *Ibid*. After defense counsel continued to ask whether in each case that the agent appeared as an expert witness he had testified that the defendant was a drug dealer and Lewis did not give a yes or no answer, the court asked whether in the cases that Lewis testified, "[h]as it been your opinion that the defendant is a drug dealer?" *Id*. at 21. Lewis responded: "Yes, it would be my opinion that the things that were found, the evidence are indicative drug trafficking [sic]." *Ibid*.

Special Agent Brian Grove of the Internal Revenue Service testified that he obtained a search warrant to search Reynolds's home and another house in Knoxville in 2007. On November 19, 2007 and again on December 10, 2007, agents found packaging materials in the trash at Reynolds's residence. Those packaging materials tested positive for cocaine. Grove also presented evidence of Reynolds's financial transactions through June 2008; he noted a marked uptick in the both the number of transactions and the amount of money in Reynolds's accounts beginning in 2005 and

again in 2007. Grove stated that of the approximately 2500 income records, about 12 reflected that they came from a legitimate source. Grove also identified several purchases that Reynolds made using American Express cards, such as time shares. In order to pay those bills, Reynolds made multiple cash deposits, each under $10,000, into several different corporate accounts, from which he paid the bills. In the period between May 15 and 20, 2008, Reynolds made multiple deposits totaling $215,000.

## B. Proceedings in the district court

A series of indictments were filed in the Eastern District of Tennessee, with the latest on May 20, 2009 charging Reynolds with one count of conspiracy to distribute and possess with intent to distribute cocaine and marijuana; four counts of possession of a firearm during and in relation to a drug trafficking crime; three counts of possession with intent to distribute cocaine; five counts of conspiracy to commit money laundering; seventeen counts of structuring financial transactions; and six counts of conspiracy to commit money laundering by engaging in monetary transactions in property derived from drug activity. Reynolds's relationships with his defense counsel can be characterized at best as stormy. He originally was represented by Donald A. Bosch, who moved to withdraw as counsel on March 10, 2009 based on an ethical conflict and breakdown in the attorney-client relationship. The magistrate judge granted Bosch's motion and appointed John E. Eldridge to represent Reynolds.

After filing motions to suppress evidence, Eldridge moved to withdraw on June 12, 2009. In an affidavit in support of the motion, Eldridge wrote that Reynolds had informed him that he was not satisfied with defense counsel's representation and wished to represent himself. On June 26,

2009, the district court granted defense counsel's motion to withdraw, stating that during the hearing that Reynolds advised the court that he wished to proceed *pro se* and finding that a breakdown in attorney-client communication had occurred. The district court permitted Reynolds to represent himself, but appointed Norman McKellar to act as standby counsel.

Reynolds filed some unsuccessful *pro se* motions, but then on August 11, 2009, Allen E. Schwartz and Gregory H. Harrison filed a notice of appearance as attorneys of record for Reynolds. On February 18, 2010, four days before trial was scheduled to begin, Schwartz and Harrison filed a motion for a continuance and to withdraw as counsel. They stated that Reynolds had refused to cooperate with defense counsel and had accused defense counsel of working with the government, and that defense counsel had been subjected to multiple daily harassing phone calls from Reynolds's family. On the same day, the magistrate judge denied defense counsels' motion, requiring them "to continue with their representation of [Reynolds] and, to put it simply, to do the best they can with what they have been given." Order, Case No. 08-cr-00143, dkt. #163, at 3.

Trial began as scheduled on February 22, 2010. The jury returned its guilty verdicts on March 8, 2010. The case was referred to the probation department for a presentence report. However, according to the pre-sentence report, Reynolds refused to be interviewed for the pre-sentence investigation. A sentencing hearing was held on October 28, 2010. At the sentencing hearing, the district court asked Reynolds whether he was represented by counsel, and Reynolds stated "I had no choice. They never showed up for me. This is pretty much the first time I seen them. They didn't go over nothing with me. I don't know what I am doing here." Sentencing Hr'g Tr., Oct. 28, 2010 at 4. Upon being told that the offense in Count I carried a mandatory sentence of

ten years and a potential sentence of life imprisonment, Reynolds stated "The first time I heard it." *Id*. at 5. At that point, the district court heard from defense counsel, who stated that they had attempted twice to discuss the pre-sentence report with Reynolds, but that Reynolds had yelled at defense counsel and refused to review the report. Attorney Schwartz stated that "the main thrust of [Reynolds's] outbursts was he didn't want us to represent him anymore, he didn't want us representing him here this afternoon." *Id*. at 10. Reynolds then stated his belief that his attorneys were working against him and had not provided him with assistance in his case. The district court interpreted that statement as a request for a continuance, and denied the request because Reynolds's own actions caused his failure to be interviewed or to review the report. The district court also observed that Reynolds had a history of difficult relationships with defense counsel and proceeded to sentence Reynolds to a life term with an additional 900 months to be served consecutively.

On the same day, defense counsel filed a motion to withdraw, stating that their contract with Reynolds terminated their responsibility for further representation at the end of the trial phase of the case and that on October 27, 2010, Reynolds had threatened Harrison with violence. The district court granted defense counsel's motion to withdraw on November 5, 2010. Reynolds filed a timely notice of appeal. New counsel was appointed to represent him. Appellate counsel filed a brief raising ten issues, and Reynolds has contributed several *pro se* filings of his own. Appellate counsel also has moved to withdraw.

II.

As mentioned, through counsel Reynolds raises ten issues for review. In addition, he filed two *pro se* motions raising counsel-of-choice and inadequate-assistance-of-counsel issues and a

notice of supplemental authority. Many of the issues involve different standards of review. We will address them in turn.

## A. Failure to hold a *Franks* hearing

Reynolds argues that the district court abused its discretion in failing to hold a *Franks* hearing to challenge the search warrants, and asserts that this error requires the court to vacate his convictions. The activity in the district court suggests that the defendant himself held inconsistent views of the merits of this issue. On April 10, 2009, Reynolds's lawyer (at the time, John Eldridge) filed two motions to suppress, along with several other pretrial motions. During oral argument before the magistrate judge, defense counsel stated that "on the *Franks* issue, we were not able to develop that, and I should have told the Court on the front end that we are not pushing far with that issue." Mot. Hr'g Tr., May 13, 2009 at 22. The next day, the magistrate judge filed a report recommending that the second of those motions be denied, and neither party objected. The district court adopted the report and recommendation on June 4, 2009. On the same day, the magistrate judge filed another report recommending that the first motion to suppress be denied as well. Reynolds's attorney filed an objection, which the district court overruled.

That was not the end of the *Franks* issue, however, at least from the defendant's point of view. On June 12, 2009, Reynolds, acting *pro se*, filed a document that appeared to be titled "Illegal Disclosure of Oral Communication" and requested a *Franks* hearing in connection with a court order for surveillance. The magistrate judge denied this motion on June 30, 2009 as untimely, but also noted that the government had represented that there were no wiretaps involved in the case, and thus Reynolds's motion was moot. The magistrate judge also stated that Reynolds's motion for a *Franks*

hearing was denied because Reynolds had not made an offer of proof of any false statements offered in support of a warrant or offered any affidavits of his own.

On January 11, 2010, Reynolds's new lawyers, Allen E. Schwartz and Gregory H. Harrison, filed another motion to suppress, seeking to suppress evidence recovered from a trash can outside of the Reynolds's residence. The motion did not request a *Franks* hearing explicitly, and it was denied as untimely by the magistrate judge on January 15, 2010.

Then on the first day of trial, defense counsel renewed the request for a *Franks* hearing that had been withdrawn by Eldridge, resubmitted by Harrison and Schwartz, and denied by the magistrate judge as untimely. Defense counsel asserted that a motion for a *Franks* hearing had been filed since their appearance in the case (we were unable to find such a motion on the docket, but counsel may have been referring to the motion to suppress filed in January 2010). Defense counsel observed that the motion cut-off date was four months prior to their appearance in the case, and argued that the defendant was prejudiced by his inability to file a further motion for a *Franks* hearing. The court denied the renewed motion for a *Franks* hearing.

The Court reviews a district court's denial of a motion to file an untimely motion to suppress for abuse of discretion. *United States v. Walden*, 625 F.3d 961, 964 (6th Cir. 2010). As the Supreme Court has recognized, district courts require wide latitude in scheduling trials and should be granted broad discretion on the issue of whether or not to grant a continuance. *See Morris v. Slappy*, 461 U.S. 1, 11-12 (1983). Federal Rule of Criminal Procedure 12(c) gives the district court broad discretion to establish, extend, and enforce motion pretrial filing deadlines. "Only in a case of the

most flagrant abuse will a court of appeals review a trial court's discretionary denial of a motion to suppress as untimely." *United States v. Francis*, 646 F.2d 251, 260 (6th Cir. 1981).

We review the decision to deny a *Franks* hearing under a split standard: a district court's findings of fact are reviewed for clear error and its conclusions of law *de novo*. *United States v. Poulsen*, 655 F.3d 492, 503 (6th Cir. 2011).

Reynolds argues that he should have been allowed to proceed with his *Franks* motion, and the district court abused its discretion when it did not accede to new counsel's request to pursue the issue, even after the motion deadline. We do not agree. Federal Rule of Criminal Procedure 12(e) states that mandatory pretrial motions — such as motions to suppress evidence, see Federal Rule of Criminal Procedure 12(b)(3)(C) — are "waive[d]" if not timely raised, and that the district court may grant relief from the waiver "[f]or good cause." Fed. R. Crim. P. 12(e); *see also United States v. Obiukwu*, 17 F.3d 816, 819 (6th Cir. 1994). "Good cause is a flexible standard heavily dependent on the facts of the particular case as found and weighed by the district court in its equitable discretion. At a minimum, it requires the party seeking a waiver to articulate some legitimate explanation for the failure to timely file." *Walden*, 625 F.3d at 965.

Here, although Reynolds's lawyer filed a timely pretrial motion for a *Franks* hearing, he withdrew the request early on, and later efforts by new counsel to renew the motion plainly were untimely. And the justifications offered for the late change of strategy did not amount to good cause. Reynolds's primary cause argument was that defense counsel did not enter the case until after the motion cut-off date. However, defense counsel was appointed in August 2009 and did not explicitly request a *Franks* hearing until the first day of trial, approximately seven months later. Reynolds did

not request an extension of the motion cut-off date, present any explanation for the delay, or explain

why a *Franks* hearing was not requested until the day that trial was scheduled to start. A change in

counsel alone is not sufficient to constitute good cause to grant relief from a waiver. *United States*

*v. Garcia*, 528 F.3d 481, 485 (7th Cir. 2008) (finding no good cause shown where defendant

switched lawyers, but new counsel failed to request a new motion deadline and filed a motion four

months after appearing in the case); *United States v. Trancheff*, 633 F.3d 697, 698 (8th Cir. 2011)

("The desire to suppress incriminating evidence and the retention of new counsel are not by

themselves sufficient to establish good cause to justify relief from a waiver of a defense, objection,

or request under Rule 12."). The district court properly exercised its discretion in denying the

request.

Moreover, to be entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), "a

defendant must make 'a substantial preliminary showing that a false statement knowingly and

intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant

affidavit and [ ] the allegedly false statement is necessary to the finding of probable cause.'"

*Poulsen*, 655 F.3d at 504 (quoting *United States v. Mastromatteo*, 538 F.3d 535, 545 (6th Cir. 2008)

(alteration in original)). Even if statements in the affidavit are false, "a *Franks* hearing is warranted"

only "[i]f, when the alleged false statement is put aside, the affidavit no longer provides the court

with probable cause." *Id*. at 504-05 (citing *Mastromatteo*, 538 F.3d at 545) (internal quotation marks

omitted).

Despite Reynolds's assertion as to the seriousness of the alleged irregularities, in his original

request for a *Franks* hearing filed on April 10, 2009, he identified only one allegedly false statement

and argued only that he would show that the statement was false. Such bare assertion of falsehood is insufficient to constitute a showing, let alone a substantial preliminary showing, either that the statement actually was false or that it was made intentionally or with a reckless disregard for the truth. *See United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 2013) ("Without a showing of falsity concerning the statements in the affidavit, [the defendant] cannot make a substantial showing that the affiant provided statements in the affidavit that he knew to be false."); *United States v. Brown*, 715 F.3d 985, 991-92 (6th Cir. 2012) (finding no substantial preliminary showing where defendant "proffered no evidence" that an allegedly false statement was made intentionally or with reckless disregard for the truth). The defendant did not identify any further allegedly false statements or make any further showing as to the affiant's intentional use of a false statement or reckless disregard for the truth when he renewed his motion on the first day of trial. Therefore, Reynolds did not make the "substantial preliminary showing" required to demonstrate entitlement to a *Franks* hearing. *Mastromatteo*, 538 F.3d at 545. There was no error in dealing with this issue.

## B. Multiple conspiracies

Reynolds argues that the government proved two conspiracies: a marijuana conspiracy and a cocaine conspiracy. He asserts that the two conspiracies involved different drugs, sources, modes of operation, time frames, distribution methods, and customers. He maintains that the only thing linking the two conspiracies is the fact that he and Nathaniel Smith were involved in both. Reynolds also argues that he was prejudiced by the variance, because the evidence of his involvement in the cocaine conspiracy was sparse and the jury could have believed that he was only involved in distributing marijuana but convicted him of both.

- 16 -

Generally, we give fresh review to whether a variance occurred between the proof and the indictment. *United States v. Robinson*, 547 F.3d 632, 642 (6th Cir. 2008). However, Reynolds did not raise the claim of a variance before the district court. Therefore, this claim is reviewed for plain error. *United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006). To obtain relief under plain error review, the appellant must demonstrate that "(1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Marcus*, 560 U.S. 258, ---, 130 S. Ct. 2159, 2164 (2010) (alteration in original) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

In the context of a conspiracy charge, a variance constitutes reversible error "only if (1) the indictment alleged one conspiracy, but the evidence can reasonably be construed only as supporting a finding of multiple conspiracies, and (2) the variance prejudiced the defendant." *United States v. Williams*, 612 F.3d 417, 423 (6th Cir. 2010) (internal quotation marks omitted). "Where the evidence demonstrates only multiple conspiracies, a defendant is prejudiced if the error of trying multiple conspiracies under a single indictment substantially influenced the outcome of the trial." *Carver*, 470 F.3d at 237. The focus of the prejudice inquiry is whether there has been a transference of guilt between the members of one conspiracy and the members of another conspiracy. *Ibid*. The risk of such a transference increases as the number of defendants at trial and the number of conspiracies increase. *Ibid*.

In this case, we find rather compelling the defendant's argument that the evidence showed separate conspiracies. However, we do not see how Reynolds was prejudiced.

Although the government cites case law stating that one drug conspiracy does not become multiple conspiracies because different sources were involved or the personnel involved in the conspiracy changed, see *United States v. Johnson*, 44 F. App'x 48, 49 (8th Cir. 2002); *United States v. Sophie*, 900 F.2d 1064, 1081 (7th Cir. 1990), the government has not pointed to a case, such as this one, in which virtually every element of two schemes was different and yet only one conspiracy was found. The only common element in these two conspiracies was the participation of Reynolds and Nathaniel Smith. In other respects, including the *modus operandi*, the other participants, the drugs involved, the time frame, the drug sources, and the customers, the conspiracies were separate. If we view the evidence in the light most favorable to the government, as we must, we might tease out a conclusion that only one conspiracy existed based on the fact that Reynolds and Smith were involved in distributing both marijuana and cocaine, there was some evidence that Betancourt sold or attempted to sell both marijuana and cocaine to Reynolds, Reynolds sold both marijuana and cocaine between late 2006 and 2008, and he used similar book-keeping and money-laundering methods in connection with both his marijuana and cocaine sales. But that stretches the evidence beyond its breaking point. As we have held, "[t]he principal considerations in determining the number of conspiracies are the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003). The only overlapping participants in the cocaine and marijuana schemes were Reynolds and Smith, and the cocaine and marijuana distribution were carried out in entirely different ways.

Under the standard described in *Smith*, the evidence presented at trial proved two separate conspiracies.

But Reynolds cannot show that he was prejudiced by the variance he identifies. *See United States v. Warman*, 578 F.3d 320, 342 (6th Cir. 2009). He argues that the jury could have found that he was only involved in distributing marijuana, but nevertheless convicted him of distributing both marijuana and cocaine, as both conspiracies were charged as a single conspiracy. But in determining prejudice, we must focus on "whether a danger exists that the defendant was convicted based on evidence of a conspiracy in which the defendant did not participate." *United States v. Blackwell*, 459 F.3d 739, 762 (6th Cir. 2006). In this case, there was abundant evidence tying Reynolds to both marijuana and cocaine distribution. His contention that no witnesses were able to identify him as the "D" to whom they sold cocaine in Tennessee is simply wrong: Joshua Correa, Carlos Betancourt, and Alfredo Alvarado all identified Reynolds as "D" and testified that they provided him with cocaine. Moreover, the risk of guilt transference was attenuated because Reynolds was tried alone. *United States v. Osborne*, 545 F.3d 440, 444 (6th Cir. 2008); *Caver*, 470 F.3d at 237. Reynolds was not prejudiced by any variance that occurred.

### C. Sufficiency of evidence of firearms convictions

Reynolds argues that the trial evidence was insufficient to support any of his four convictions for possession of a firearm in furtherance of drug trafficking crimes under 18 U.S.C. § 924(c). The defendant moved for a judgment of acquittal at the close of proofs and again within fourteen days after the jury's verdict. *See* Fed. R. Crim. P. 29(c). Therefore, we give fresh review to the district court's determination of the sufficiency of the evidence. *United States v. Humphrey*, 279 F.3d 372,

378 (6th Cir. 2002). We will uphold the verdict if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Circumstantial evidence alone may support a verdict of guilt if it is "substantial and competent." *United States v. Talley*, 194 F.3d 758, 765 (6th Cir. 1999).

We have held that 18 U.S.C. § 924(c) defines two separate offenses: *first*, using or carrying a firearm "during and in relation to" a drug trafficking crime; and *second*, possessing a firearm "in furtherance of" a drug trafficking crime. *United States v. Combs*, 369 F.3d 925, 930-32 (6th Cir. 2004). The distinction is not without a difference. For the first offense, proof of use or carrying is more rigorous that proof of mere possession. *Id.* at 932-33 (citing *Bailey v. United States*, 516 U.S. 137, 143 (1995), and *Muscarello v. United States*, 524 U.S. 125, 126-27 (1998)). And for the second offense, proving the "in furtherance" element is more demanding than proving the "during and relation to" element of the first offense. *Id.* at 933. The parties agree here that the four firearms counts of the second superseding indictment charged "possession" "in furtherance of."

The possession element of the crime is satisfied by demonstrating that a defendant had actual or constructive possession of the firearm. *United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009). An individual has actual possession of a firearm if it is under his direct physical control. *Ibid*. An individual has constructive possession of a firearm if he "does not have actual possession but instead *knowingly* has the power and the *intention* at a given time to exercise dominion and control over an object, either directly or through others." *Ibid*. (quoting *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973)).

- 20 -

In order to establish the "in furtherance" prong, the government must demonstrate a "specific nexus between the gun and the crime charged." *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001). This nexus can be established by showing that the gun is "strategically located so that it is quickly and easily available for use," which requires more than a mere showing that a defendant possessed a firearm on the same premises where a drug transaction took place. *Ibid*. Among the factors to be considered in determining whether a defendant has possessed a gun in furtherance of a drug trafficking crime are "whether the gun was loaded, the type of weapon, the legality of its possession, the type of drug activity conducted, and the time and circumstances under which the firearm was found." *Ibid*.

Reynolds does not dispute that he possessed the firearms charged in each of the four counts. The only remaining question is whether the proofs demonstrate possession of the firearms "in furtherance" of drug trafficking. We find the evidence is more than sufficient to support each of the gun convictions.

Reynolds's first conviction was for possession of a Bushmaster assault rifle in December 2006, when he traveled to Nashville from Knoxville with the rifle, intending to reclaim marijuana that had been stolen from Smith at gunpoint. Reynolds argues that seeking revenge on the individuals who stole the marijuana has nothing to do with his drug trafficking crime. However, as the government observes, the crime of conspiracy to distribute marijuana is not limited to the actual distribution of marijuana, and the jury reasonably could have found that Reynolds carried the rifle to aid in his attempted retrieval of marijuana and to protect him on his expedition. We have held consistently that possessing a gun as protection in the course of drug trafficking is sufficient to

- 21 -

satisfy the "in furtherance" element. *See United States v. Thornton*, 609 F.3d 373, 381 (6th Cir. 2010); *United States v. Mohammad*, 501 F. App'x 431, 439-40 (6th Cir. 2012); *United States v. Kelsor*, 665 F.3d 684, 693 (6th Cir. 2011); *United States v. Thornton*, 609 F. 3d 373, 381 (6th Cir. 2010); *United States v. Craft*, 150 F. App'x 413, 416 (6th Cir. 2005); *see also United States v. Beckford*, 176 F. App'x 299, 302-03 (3d Cir. 2006) (finding that a defendant used a firearm in furtherance of a drug trafficking offense when he brought the firearm with him to confront a person who had "misplaced" some of the defendant's marijuana). The evidence is sufficient to support Reynolds's conviction on this count.

Reynolds's second firearm conviction was for his possession of two loaded guns, including an Uzi, during his first face-to-face meeting with Betancourt. Betancourt testified that he was not surprised that Reynolds would carry weapons to a first meeting with a new supplier. The jury reasonably could have found that Reynolds carried the firearms to that meeting for protection. As discussed above, that would be sufficient to support the conviction. The jury also could have found, based on Betancourt's testimony, that Reynolds gave the guns to Betancourt as collateral for several kilograms of cocaine. *See United States v. Reyes*, 362 F.3d 536, 543 (8th Cir. 2004) (finding that where a defendant provided a drug purchaser with a gun as a "trust-seeking transaction" to facilitate future drug transactions, a reasonable jury could find that the defendant possessed the gun in furtherance of a drug trafficking crime). In either case, the evidence was sufficient to support the second conviction.

Reynolds's third conviction was for the possession of an assault rifle that was mounted on a tripod in his basement and pointed at the door. The evidence demonstrated that the gun was readily

available in a room where Reynolds engaged in many drug transactions and that it was positioned facing the door in a way that likely was meant to intimidate those with whom Reynolds did business. *See Mackey*, 265 F.3d at 462. A jury reasonably could have found that Reynolds possessed the gun and positioned it in the basement in order to protect himself during the drug transactions that took place there.

The fourth conviction was for the possession of a FN Herstel 5.7 rifle, described in the testimony as a "cop-killer," which Reynolds gave to Betancourt. The testimony at trial establishes that Betancourt, who was Reynolds's main contact with his cocaine suppliers, previously had told Reynolds that the Mexican cartel wanted such guns. Reynolds argues that the only basis for this charge was the presence of the firearm in the Reynolds's home; however, Betancourt testified that Reynolds gave him this weapon. Viewed in the light most favorable to the government, a reasonable jury could find that Reynolds gave Betancourt this weapon to further his drug-trafficking relationship with Betancourt.

We find no defect in the sufficiency of proof of the firearms convictions.

### D. Sufficiency of evidence of money laundering

The defendant contends that his money laundering convictions must be reversed because the government failed to prove an intent to conceal. We employ the same standard of review as discussed in the previous section.

The defendant's argument is complicated somewhat by the fact that the indictment charged three different species of money laundering in its various counts: (a) engaging in monetary transactions in property derived from a specified unlawful activity in violation of 18 U.S.C. § 1957;

(b) promotional money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and (c) concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The indictment refers to 18 U.S.C. § 1956(h), which is the conspiracy section and incorporates all forms of money laundering in sections 1956 and 1957.

Reynolds challenges only the sufficiency of the evidence presented that he intended to conceal the fact that his funds were derived from illegal activity. Of the eleven money laundering counts, only four dealt with concealment money laundering. Concealment is not an element of promotional money laundering (count 32), *United States v. Reed*, 264 F.3d 640, 650 (6th Cir. 2001), or unlawful activity money laundering (counts 29, 30, 31, 36, 37, and 38), *See United States v. Kratt*, 579 F.3d 558, 560 (6th Cir. 2009).

Count eleven of the second superseding indictment charged the defendant under both the promotion and concealment portions of the statute. Reynolds properly could have been convicted solely under the promotional portion of this count without proof of the intent to conceal. *See United States v. Miller*, 471 U.S. 130, 136 (1985) (holding that convictions may be sustained "as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment"); *United States v. Weinstock*, 153 F.3d 272, 279 (6th Cir. 1998). Therefore, to the extent that Reynolds seeks review of his convictions of counts 29 through 32 and 36 through 38, the argument is deemed waived, as Reynolds has not presented any argument that actually undermines those convictions. *United States v. Layne*, 192 F.3d 556, 566-67 (6th Cir. 1999).

The three convictions for concealment money laundering all involve American Express transactions. Reynolds argues that the government proved only that he used potentially illegal funds

to fund those purchases. However, Agent Grove's testimony at trial demonstrated that Reynolds funneled cash into various corporate bank accounts, making deposits that normally were smaller than $10,000, and sometimes moved cash between the various bank accounts. Reynolds then used those structured funds to make payments on his American Express card purchases. Moreover, both Antonio Santa Cruz and Carlos Betancourt testified that Reynolds sought to avoid "red flags" by making deposits of less than $10,000, suggesting an intent to conceal the origins of those deposits. That evidence is sufficient to sustain a conviction for concealment money laundering. *United States v. Warshak*, 631 F.3d 266, 320-21 6th Cir. 2010) (finding that a complex sequence of transactions would permit a reasonable juror to conclude that the transactions were undertaken to conceal the source of the money even where the individual transactions were made openly); *United States v. Beddow*, 957 F.2d 1330, 1335 (6th Cir. 1992) (holding that evidence of "convoluted financial dealings" with banks supported a conclusion that the defendant intended to conceal the source of his funds).

Reynolds's reliance on *Warshak* is misplaced. In that case, we held that one defendant had engaged in a complex series of transactions that supported a finding of an intent to conceal. The court contrasted that defendant's behavior with that of a second defendant who engaged in "relatively simple" transactions involving "large amounts that would not easily have escaped the notice of banks and regulators." *Warshak*, 631 F.3d at 323. Reynolds, who engaged in complex transactions with deposits under $10,000, resembles the first defendant much more closely. Likewise, Reynolds's citation of *United States v. Marshall*, 248 F.3d 525, 540-41 (6th Cir. 2001), does not aid his

argument, as the defendant in that case merely purchased luxury goods with his illegal proceeds. There was no want of proof on the concealment money laundering counts.

## E. "Expert" witness testimony

Reynolds argues that the testimony of DEA agent David Lewis was improper because he testified in a summary fashion, directed the jury to a verdict, and provided a closing argument from the stand. The defendant objected only to one aspect of Lewis's testimony: his characterization and description of the contents of the drug ledger. We review that evidentiary ruling for abuse of discretion. *United States v. Ashraf*, 628 F.3d 813, 826 (6th Cir. 2011). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard." *United States v. Chambers*, 441 F.3d 438, 446 (6th Cir. 2006) (internal quotation marks omitted). The admission of expert testimony is evaluated under the same standard. *United States v. Bender*, 265 F.3d 464, 472 (6th Cir. 2001). But where no objection was made at trial, as is the case with many other aspects of Lewis's testimony, we will review the admission of expert testimony for plain error. *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007).

"Law enforcement officers may testify concerning the methods and techniques employed in an area of criminal activity and to establish 'modus operandi' of particular crimes. Knowledge of such activity is generally 'beyond the understanding of the average layman.'" *United States v. Pearce*, 912 F.2d 159, 163 (6th Cir. 1990) (quoting *United States v. Espinosa*, 827 F.2d 604, 611 (9th Cir. 1987)). However, an expert witness may not testify "that a defendant in a criminal case did or did not have the requisite mental state or condition constituting an element of the crime charged, as ultimate issues are matters for the trier of fact." *United States v. Combs*, 369 F.3d 925, 940 (6th

Cir. 2004); Fed. R. Evid. 704(b). In determining whether the expert proffered testimony as to the intent of the defendant, the Court should examine "whether the expert actually referred to the intent of the defendant or, instead, simply described in general terms the common practices of those who clearly do possess the requisite intent." *United States v. Frost*, 125 F.3d 346, 383-84 (6th Cir. 1997) (quoting *United States v. Lipscomb*, 14 F.3d 1236, 1239 (7th Cir. 1994)).

The admission of Lewis's testimony as to the contents of the drug ledger — the only testimony by Lewis to which defense counsel objected at trial — was not an abuse of discretion because it was within the scope of Lewis's expertise in the methods employed by drug traffickers. *United States v. Lopez-Medina*, 461 F.3d 724, 742-43 (6th Cir. 2006). However, Lewis testified to much more than that, and in doing so trespassed far into forbidden territory. His testimony that the drug ledger corroborated witness testimony in the case, that Reynolds carried firearms for specific purposes, and that he personally believed Reynolds to be a drug dealer plainly was improper, as it was not based on Lewis's expertise, improperly invaded the jury's role as the ultimate fact-finder, and was impermissible testimony as to the defendant's intent. *Combs*, 369 F.3d at 940 (stating that an expert witness may not testify to the intent of the defendant); *see also Warshak*, 631 F.3d at 324 (finding improper testimony that transactions were undertaken with an "intent to conceal"); *United States v. Henderson*, 626 F.3d 326, 337 (6th Cir. 2010) (holding that the question of a witness's credibility is one for the jury); *United States v. Smith*, 601 F.3d 530, 540 (6th Cir. 2010) (citing with approval *United States v. Cruz*, 981 F.3d 659, 663 (2d Cir. 1992) (holding that testimony that was, in effect, a statement by a police expert that a fact witness was believable was improper)).

But because Reynolds did not object to this testimony at trial, we review the receipt of the evidence only for plain error. "Plain error occurs where there is (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Ehle*, 640 F.3d 689, 699 (6th Cir. 2011) (internal quotation marks and alterations omitted). In three of the instances of Mr. Lewis's unfortunate testimony — affirming the credibility of the witnesses, discussing Reynolds's reasons for carrying a firearm, and stating that he believed that Reynolds was a drug dealer — the first two requirements of plain error review are met. The admission of this testimony was error. Moreover, that error was plain. The fact that this court previously has approved of Lewis's testimony in other cases does not alter this fact.

However, Reynolds's argument fails on the third and fourth requirements for three reasons. First, at the close of Lewis's first day of testimony, and again during the final jury instructions, the district court instructed the jury that it was not required to accept anything that Lewis said. Jurors are presumed to follow such instructions. *United States v. Olano*, 507 U.S. 725, 740 (1993). And proper jury instructions can mitigate the prejudice resulting from improper testimony. *Slagle v. Bagley*, 457 F.3d 501, 526 (6th Cir. 2006).

Second, as the government observes, Lewis's testimony as to his belief that Reynolds was a drug dealer was occasioned by defense questioning. Neither of the cases that the government cites in support of this argument state that testimony occasioned by defense questioning cannot be error, or even that such testimony should be scrutinized more closely. *See United States v. Parish*, 606

- 28 -

F.3d 480, 490-91 (8th Cir. 2010) (discussing a defendant's objection to a response to a question posed by the government to the government's expert witnesses); *United States v. Sharpe*, 996 F.2d 125, 128-29 (6th Cir. 1993) (stating that the court will not find plain error based on a mistaken jury instruction if the instruction was requested by the defendant). However, we have held that under the invited error doctrine, "where the injection of allegedly inadmissible evidence is attributable to the action of the party seeking to exclude that evidence, its introduction does not constitute reversible error." *All American Life & Cas. Co. v. Oceanic Trade Alliance Council Int'l, Inc.*, 756 F.2d 474, 479-80 (6th Cir. 1985). The fact that Lewis's statements came in response to defense questioning — questioning that, at least in one instance, seemed to invite the precise response given by Agent Lewis — suggests that the testimony is less likely to have "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Ehle*, 640 F.3d at 699.

Third, the improper testimony is less likely to have affected the defendant's substantial rights because the other evidence against him was overwhelming. The government presented testimony from several co-conspirators detailing Reynolds's drug trafficking activities over a span of several years, testimony of an individual from whom Reynolds had purchased numerous cars using cash, and the testimony of Agent Grove that Reynolds appeared to have no legitimate source of income and that drug packaging materials had been found outside Reynolds's house. In light of this overwhelming evidence of Reynolds's guilt, it is unlikely that Agent Lewis's improper testimony affected the defendant's substantial rights or seriously affected the fairness, integrity, or public reputation of the proceedings. *See Warshak*, 631 F.3d at 325 (finding that although an expert witness's testimony as to a defendant's intent was error, the error was harmless because of the large

amount of evidence against the defendant and the government's clarification that it was not seeking evidence of the defendant's intent).

We conclude, therefore that although much of Agent Lewis's testimony plainly was improper, irrelevant, unhelpful to the jury, and prejudicial to the defendant, the plain error rule precludes reversal.

### F.  The sequestration ruling

The defendant contends that the district court erred by exempting Lewis from the sequestration order.  We review that issue for abuse of discretion.  *Ashraf*, 628 F.3d at 826.

Federal Rule of Evidence 615 states that "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony." Fed. R. Evid. 615.  But the rule specifically states that  "a person whose presence a party shows to be essential to presenting the party's claim or defense" may stay.  Fed. R. Evid. 615(c).  A classic example of that exception is "an expert witness who does not testify to the facts of the case but rather gives his opinion based upon the testimony of others." *Morvant v. Construction Aggregates Corp.*, 570 F.2d 626, 629 (6th Cir. 1978); *see also United States v. Mohney*, 949 F.2d 1397, 1404-05 (6th Cir. 1991) (adopting this reasoning in the criminal context).

Plainly, the district court's decision to exempt Lewis from the sequestration order was not an abuse of discretion.  The government proposed to call Lewis to testify as an expert witness, and Lewis, who did not participate personally in the investigation, was to base his opinion on the testimony given at trial.  In such circumstances, a trial court's decision to exempt a witness from a

sequestration order "should not normally be disturbed on appeal," *Morvant*, 570 F.2d at 630, and we will not do so here.

### G.  Refusal to allow reopening proofs

After testimony, the jury began its deliberations on March 5, 2010, a Friday.  On Monday, March 8, 2010, the jury indicated that it was prepared to return a verdict.  Shortly before that point, the defendant filed a motion to reopen the proofs, alleging that the defendant had located a witness who could testify that in 2004 he gave Reynolds $225,000 in cash to assist him in the music business.  The Court denied the motion because it was untimely, the evidence related to an earlier time frame than the events in the case, and the proof the witness proposed to offer was unverified and unsworn.  The defendant contends the ruling was erroneous.  A district court's decision on a motion to re-open the proof is reviewed for abuse of discretion.  *United States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985).

In deciding a motion to re-open the proofs after both parties have rested, the court must consider three factors: the timeliness of the motion, the character of the testimony, and the effect of granting the motion.  *Blankenship*, 775 F.3d at 741.  Of these three factors, the most important is whether the opposing party will be prejudiced if the proof is re-opened.  *Ibid*.  The key factor in the prejudice inquiry is the timeliness of the motion; re-opening the case is more likely to be prejudicial when sought "after all parties have rested, or . . . the case has been submitted to the jury." *Ibid*.  The party seeking to re-open the case "should provide a reasonable explanation for failure to present the evidence in its case-in-chief." *Ibid*. (quoting *United States v. Thetford*, 676 F.2d 170, 182 (5th Cir. 1982)).

Reynolds's motion to re-open the proof was not timely, as it was filed after both parties had concluded their cases and presented closing arguments, the court had instructed the jury, and the jury was deliberating. Prejudice to the government would have been likely; *Blankenship* makes clear that the risk of prejudice increases when a motion is made after the parties have rested or the case has been submitted to the jury. Here, the jury was knocking on the door with its verdict.

The proposed testimony would not have assisted the defense so substantially as to render the district court's decision an abuse of discretion. It is true that the government's case rested in part on the fact that Reynolds had wealth that could not be explained by legitimate business. However, the government also presented testimony from numerous drug suppliers, purchasers, and co-conspirators in support of its allegation that Reynolds was involved in drug trafficking. Evidence that an individual had provided Reynolds with funds in 2004 would do little to undermine that testimony, especially considering that the government provided evidence that Reynolds had access to wealth far in excess of the $225,000 allegedly supplied by the prospective witness.

And Reynolds did not provide any explanation why he could not locate the witness before the close of his case, or even a representation that he was trying to find him. Presumably, he himself had knowledge of this cash payment by the prospective witness; there was nothing preventing him from seeking out the witness in the months leading up to the trial. There was no abuse of discretion in failing to reopen the proofs. *See United States v. Bayer*, 331 U.S. 532, 537-39 (1947) (finding that a failure to re-open proof to introduce defendant's evidence after the case had been submitted to the jury was not reversible error); *Grotto v. Herbert*, 316 F.3d 198, 208 (2d Cir. 2003) (finding no error where a trial court denied defendant's motion to re-open proofs prior to closing arguments because

there was no foundation for the testimony and the jury might have given the evidence unwarranted weight); *United States v. Nick*, 398 F. App'x 404, 410-12 (10th Cir. 2010) (finding no abuse of discretion in district court's decision to deny defendant's motion to re-open proofs after both parties had rested and the court had instructed the jury where the defendant gave no excuse for his failure to present the testimony earlier).

### H. Misconduct during closing argument

Ordinarily, whether a prosecutor has committed misconduct in closing arguments is a mixed question of law and fact that is reviewed *de novo*. *United States v. Emuegbunam*, 268 F.3d 377, 403-04 (6th Cir. 2001). Because there was no objection in the trial court, however, we review for plain error. *United States v. Benson*, 591 F.3d 491, 499 (6th Cir. 2010).

Reynolds's claims of improper argument fall into three categories: *first*, the prosecutor's argument that Reynolds brought Mexican drug cartels to the area constituted a "scare tactic"; *second*, the government misrepresented the money laundering counts to the jury by implying that concealment was not an element of the offense; and *third*, the government's statements implied that the defendant should have presented evidence to the jury.

A prosecutor may not misrepresent the evidence, express personal belief in the defendant's guilt, vouch for witnesses, attempt to shift the burden of proof to the defendant, or appeal to the passions, fears, or prejudices of the jury. *United States v. Wiedyk*, 71 F.3d 602, 611 (6th Cir. 1995); *United States v. Causey*, 834 F.2d 1277, 1283 (6th Cir. 1987); *Byrd v. Collins*, 209 F.3d 486, 537 (6th Cir. 2000); *United States v. Bond*, 22 F.3d 662, 669 (6th Cir. 1994); *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991). However, the prosecutor is free to "summarize the evidence

and comment on its quantitative and qualitative significance," *Bond*, 22 F.3d at 669, and may "argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence," *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005).

If the Court determines that the prosecutor's argument was improper, it must then inquire whether it was flagrant and warrants reversal. *Emuegbunam*, 268 F.3d at 404 (citing *United States v. Tocco*, 200 F.3d 401, 420-21 (6th Cir. 2000)). To determine whether an argument was flagrant, the Court examines four factors: "1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused." *Tocco*, 200 F.3d at 420 (citations and internal quotation marks omitted). If the argument was not flagrant, reversal may nevertheless be warranted if "1) the proof of the defendant's guilt is not overwhelming; 2) the defense counsel objected; and 3) the trial court failed to cure the impropriety by failing to admonish the jury." *Id*. at 421 (citations and internal quotation marks omitted).

The government's argument that the defendant brought Mexican drug cartels into the local community is the sort of appeal to the jury's passions or prejudices that would constitute misconduct. *See Solivan*, 937 F.2d at 1148 (finding that a prosecutor's request to the jury to "tell [the defendant] and all of the other drug dealers like her . . . [t]hat we don't want that stuff in Northern Kentucky" constituted reversible error, especially in light of the heightened rhetoric surrounding the war on drugs). Here, although the prosecutor did not explicitly ask the jurors to send a message to other criminals with their verdict as was found impermissible in *Solivan*, the prosecutor did imply that the

defendant represented a danger to the community and suggested that a conviction would result in the Mexican cartels leaving Knoxville. The prosecutor's statements clearly were an "attempt . . . to associate the defendant with a feared and highly publicized group." *Id.* at 1154.

But the misconduct was not flagrant. The statements were isolated. They "did not mislead the jury because it did not marshal them to punish all the drug dealers in their community by convicting [the defendant]; rather, the comment accurately identified [Reynolds] as [a] drug dealer[]" who dealt with a Mexican cartel. *United States v. Wettstain*, 618 F.3d 577, 589-90 (6th Cir. 2010). There is no evidence that the prosecutor intentionally sought to mislead or prejudice the jury. And, as noted above, the case against the defendant was strong. We do not find that the prosecutor's statements "seriously affect[ed] the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Henry*, 545 F.3d 367, 384 (6th Cir. 2008).

The defendant's complaint about the government's description of the money laundering crimes does not warrant relief because the description was not improper. As discussed above, Reynolds was charged with money laundering under 18 U.S.C. § 1957, which does prohibit transactions such as those described by the prosecutor, and does not require an intent to conceal. Therefore, the prosecutor's statement was a correct statement of the law.

The prosecutor's statements that Reynolds could have called Courtney Hensley as a witness and that there was no evidence that a Super Bowl party had ever occurred was not improper. The witness comment was a response to defense counsel's repeated argument that the prosecutor did not call Courtney Hensley to the stand to testify, and therefore was "invited by defense counsel's conduct." *United States v. Gonzalez*, 512 F.3d 285, 292 (6th Cir. 2008) (citing *United States v.*

*Barnett*, 398 F.3d 516, 522-23 (6th Cir. 2005)). The argument that there was no evidence that a Super Bowl party took place is "best characterized as an attempt to summarize the evidence and comment on its probative value, with minimal prejudice to [the] defendant." *Bond*, 22 F.3d at 669. Although the defendant is not required to produce any evidence, the prosecutor is permitted to comment on the "quantitative and qualitative significance" of the evidence. *Ibid*. The prosecutor's statement was not error. *See Bates*, 402 F.3d at 646 ("To be certain, prosecutors can argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence.").

The prosecutor's comment that the defendant had the power to subpoena Courtney Hensley is more troubling. However, as the government notes, this statement was a response to defense counsel's repeated argument that the prosecutor did not call Courtney Hensley to the stand to testify. This context makes it less likely that the jury would "naturally and necessarily" construe the prosecutor's statement as a comment on the appellant's silence. *Bond*, 22 F.3d at 669. Instead, the jury more likely believed that the statement was intended to rebut defense counsel's implication that the government was attempting to hide Courtney Hensley. Indeed, when examining whether a prosecutor's remarks are improper, the court should consider the remarks "with particular attention to whether they may have been invited by defense counsel's conduct." *Gonzalez*, 512 F.3d at 292 (citing *Barnett*, 398 F.3d at 522-23). In addition, as noted above, the evidence against the appellant was overwhelming. The Court finds, therefore, that the prosecutor's comments did not adversely affect Reynolds's substantial rights. No relief is warranted on this claim of error.

*I.* Sentencing error

Reynolds argues that his sentence of life plus 900 months was unreasonable in light of the facts of the case and his background. He believes that each of the factors in 18 U.S.C. § 3553(a) warranted a sentence of no more than eighty-five years, and he offers three reasons. *First*, he had no criminal record, had attended college, and was amenable to rehabilitation. *Second*, the sentence did not serve the needs of deterrence or rehabilitation, and although it met the goal of retribution, it was "overkill." *Third*, the sentence creates unwarranted disparities because similarly situated defendants in this circuit have received much shorter sentences.

We review the reasonableness of a sentence using an abuse-of-discretion standard. *United States v. Carter*, 510 F.3d 593, 600 (6th Cir. 2007) (citing *Gall v. United States*, 552 U.S. 38, 46 (2007). A sentence must be both substantively and procedurally reasonable. *Ibid.* We first must assure ourselves that "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51. If the sentence is procedurally reasonable, we must then examine the sentence for substantive unreasonableness. *Ibid*. A sentence may be found to be substantively unreasonable if the sentencing judge "selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008).

"District courts are obligated to impose 'a sentence sufficient, but not greater than necessary' to fulfill the purposes of sentencing." *United States v. Lanning*, 633 F.3d 469, 474 (6th Cir. 2011) (quoting 18 U.S.C. § 3553(a)). However, we grant significant deference to sentences imposed by the trial court because of the trial court's greater ability to find facts and determine their import. *United States v. Mayberry*, 540 F.3d 506, 519 (6th Cir. 2008). And if the sentence is within the guideline range, we apply a presumption of reasonableness. *United States v. Vonner*, 516 F.3d 382, 389-90 (6th Cir. 2008) (en banc).

Reynolds has not alleged that his sentence was procedurally unreasonable, and it was within the guideline range. However, he argues that the sentence does not achieve the purpose of rehabilitation and that the district court improperly failed to take into account his amenability to rehabilitation. We have recognized that rehabilitation remains an important goal within the criminal justice system, particularly when considering sentencing options other than prison and administering supervised release. *United States v. Deen*, 706 F.3d 760, 763-64 (6th Cir. 2013). And as the government points out, the Supreme Court held that sentencing courts are precluded "from imposing or lengthening a prison term to promote an offender's rehabilitation." *Tapia v. United States*, --- U.S. ---, 131 S. Ct. 2382, 2391 (2011). But once the court has chosen prison as the appropriate sentencing option (the other two being probation or a fine, 18 U.S.C. § 3551(b)) — a choice that in this case is beyond debate — rehabilitation drops out of the calculus when deciding on the length of the prison term. *Ibid*. ("Congress did not intend that courts consider offenders' rehabilitative needs when imposing prison sentences."); *but see id.* at 2390 n.5 (noting the government's argument that "'Congress did not intend to prohibit courts from imposing *less* imprisonment in order to

promote a defendant's rehabilitation[,]'" a position that the Supreme Court did not address).

Because the district court did not consider rehabilitation as a factor in choosing prison as a

sentencing option, or in determining the length of Reynold's prison sentence, in the context of the

record, the sentencing court's failure to address specifically the defendant's rehabilitation does not

render the sentence substantively unreasonable.

Reynolds also argues that the sentence creates unwarranted disparities. In support of this

argument, he cites several decisions in which similarly situated defendants were given shorter prison

sentences. However, the cases that he cites are all distinguishable. The defendant in *United States*

*v. Williams*, 612 F.3d 417 (6th Cir. 2010), was found responsible for distributing more than 150

kilograms of cocaine and sentenced to 292 months in prison. *Id*. at 420. Unlike Reynolds, however,

Williams was found guilty only of conspiring to distribute more than five kilograms of cocaine, and

not possession of a firearm during and in relation to a drug trafficking crime, money laundering, or

structuring. *Ibid.* Similarly, the defendant in *United States v. Auston*, 355 F. App'x 919 (6th Cir.

2009), was convicted only of conspiracy to distribute more than 150 kilograms of cocaine and

engaging in interstate travel in furtherance of an illegal activity. *Id*. at 921. The defendant in *United*

*States v. Brown*, 417 F. App'x 488 (6th Cir. 2011), likewise was convicted only of conspiracy to

distribute five kilograms or more of cocaine. *Id*. at 489. Unlike Reynolds, the defendant in *United*

*States v. Presley*, 547 F.3d 625 (6th Cir. 2008), was sentenced with a co-defendant who was given

a much shorter sentence based on an agreement to forfeit $1.2 million dollars and withdraw a motion

for a new trial. *Id.* at 628. Further, as the government points out, Reynolds's sentence was within

the guideline range, and one purpose of guideline sentences is to eliminate sentencing disparities. *United States v. Kirchhof*, 505 F.3d 409, 414 (6th Cir. 2007).

Finally, Reynolds compares his sentence to that meted out in *United States v. Delgadillo*, 318 F. App'x 380 (6th Cir. 2009). In that case, the court found that a sentence at the bottom of the guideline range was substantively unreasonable. *Id*. at 386. Reynolds argues his sentence was likewise longer than necessary to serve the purposes of sentencing. However, our reversal of the sentence was based, at least in part, on our finding that the sentencing court had failed to consider the factors in §3553(a) and explain why, in light of the defendant's limited criminal history and family responsibilities, a sentence of the mandatory minimum was insufficient. *Id*. at 387. In contrast, here, the sentencing court recounted at length its reasons for the sentence it imposed, including the gravity of Reynolds's crimes, the fact that he armed himself with multiple weapons, was a leader in the conspiracy, showed no remorse and continued to deny responsibility for his actions, the need for both general and specific deterrence, and the need for consistency in sentencing. Reynolds has failed to rebut the presumption of reasonableness of the sentence or demonstrate that the sentencing judge "select[ed] a sentence arbitrarily, base[d] the sentence on impermissible factors, fail[ed] to consider relevant sentencing factors, or [gave] an unreasonable amount of weight to any pertinent factor." *Conatser*, 514 F.3d at 520.

### J. Failure to replace counsel at sentencing

Reynolds argues that in light of the breakdown in communications with defense counsel, it was reversible error for the district court to proceed to sentencing without providing a replacement

attorney. We review that claim for abuse of discretion. *United States v. Sullivan*, 431 F.3d 976, 979 (6th Cir. 2005).

A criminal defendant is entitled to the effective assistance of counsel at sentencing. *Goodwin v. Johnson*, 632 F.3d 301, 318 (6th Cir. 2011). "Once a defendant expresses his dissatisfaction with counsel, the district court is obliged to conduct an inquiry into the defendant's complaint to determine whether there is good cause for substitution of counsel." *United States v. Vasquez*, 560 F.3d 461, 466 (6th Cir. 2009). In determining whether the district court abused its discretion in denying a motion to substitute counsel, the Court considers four factors: "(1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice." *Ibid.* (quoting *United States v. Mack*, 248 F.3d 548, 556 (6th Cir. 2001)).

Prior to sentencing, defense counsel filed a motion to withdraw. At the sentencing hearing, Reynolds made his dissatisfaction with counsel clear, stating that defense counsel was incompetent, colluding with the government, embezzling from his parents, and "in a conspiracy actually trying to get me tied into slavery." Sentencing Hr'g Tr., Oct. 28, 2010 at 11. Despite Reynolds's obvious dissatisfaction with his lawyer, the district court did not, as required, inquire whether good cause existed for the substitution of counsel. *See Vasquez*, 560 F.3d at 466. Instead, the court interpreted Reynolds's dissatisfaction as a request for a continuance and denied the request.

However, despite the district court's procedural error, an examination of the factors outlined in *Mack* compels the conclusion that the district court did not abuse its discretion in failing to appoint the defendant new counsel on the day of sentencing. First, the defendant's request and defense counsel's motion to withdraw were both untimely. The requests were presented on the day of sentencing; to grant them would have required the court to grant a continuance. In such situations, the district court's determinations are entitled to "extraordinary deference." *Vasquez*, 560 F.3d at 467 (quoting *United States v. Whitfield*, 259 F. App'x 830, 834 (6th Cir. 2008)).

Second, although the district court ultimately did not consider substituting counsel, the district court inquired at length into the conflict between Reynolds and his attorneys. The court made inquiry of both of the lawyers as well as Reynolds himself. Reynolds had ample "opportunity to explain the basis for his dissatisfaction with counsel and to establish good cause for the appointment of substitute counsel." *Whitfield*, 259 F. App'x at 834.

Third, although the record reflects that the conflict between Reynolds and his lawyers was significant, and that communication had broken down between them, that alone is insufficient to establish that the district court abused its discretion. The procedural history in the district court demonstrates that Reynolds had a history of tumultuous relationships with his attorneys. In fact, at the time of sentencing, Reynolds's lawyers were the fourth and fifth attorneys to represent him in this case, and they had attempted previously to withdraw before trial based on his lack of cooperation with them. Testimony from both of the attorneys and from a probation officer who accompanied defense counsel to interview Reynolds for the pre-sentence report reflects that Reynolds refused to speak to his counsel and became belligerent when they attempted to speak with him about the pre-

sentence report. A defendant's refusal to cooperate with counsel does not constitute good cause for substituting counsel. *Vasquez*, 560 F.3d at 468; *Jones v. Tennessee*, 805 F.2d 1034 (6th Cir. 1986) (Table). Moreover, although communication had broken down between Reynolds and his attorneys, defense counsel nevertheless was able to lodge objections to the pre-sentence report and present two witnesses to testify on Reynolds's behalf at sentencing. We conclude that the breakdown in communication did not leave defense counsel unable to act in Reynolds's interest at sentencing. Therefore, we are comfortable in concluding that it was not an abuse of discretion for the district court to fail to order a substitution of counsel for the defendant.

Fourth and finally, the public had an interest in seeking the sentence pronounced against the defendant in a timely manner. Reynolds had been adjudged guilty nearly eight months prior to the sentencing hearing; the trial itself had been continued because of Reynolds's change in counsel. Upon consideration of the *Mack* factors and the circumstances of Reynolds's trial, we find no abuse of discretion in the district court's decision to proceed to sentencing without providing a substitution of counsel for the defendant.

## III.

Unsurprisingly, Reynolds appears not to be satisfied with the breadth of his attorney's appellate brief, and he has filed several motions in this court raising additional issues. We will address them now.

### A. Collateral attacks

Reynolds filed two motions that appear to be collateral attacks on his sentence. One motion is entitled "Pro Se Petition for Release by Writ of Habeas Corpus Presenting Prohibition to

Imprisonment Under the Sixth Amendment." In that motion, he argues that he was deprived of his Sixth Amendment right to counsel of choice when the magistrate judge granted Donald Bosch's motion to withdraw.

Later, Reynolds filed a motion entitled "Appellates Motion to Default Appeals for Want of Assistance of Counsel Seeking Prohibition Under the Protections Guaranteed by the Sixth Amendment." In that motion, he argues the appellate brief submitted on his behalf fails to subject the district court judgment to meaningful testing and that his appellate counsel is ineffective. The defendant reasons that because he is left without assistance of counsel on appeal, this court must reverse the district court's judgment.

In general, a defendant may not raise a claim for ineffective assistance of counsel on direct appeal. *Sullivan*, 431 F.3d at 986 (citing *United States v. Williams*, 176 F.3d 301, 312 (6th Cir. 1999)). The preferred route for raising such claims is in a post-conviction proceeding under 28 U.S.C. § 2255, so that the parties can develop an adequate record. *Ibid.* (citing *United States v. Barrow*, 118 F.3d 482, 494 (6th Cir. 1997)). Although we have addressed ineffective assistance of counsel claims on direct appeal, we will do so only where the record is developed sufficiently to address the claim. *Ibid.* Here, the record might be developed more fully, particularly since the defendant went through a number of attorneys in search of satisfaction, which apparently eluded him. He likely will have more to say on these points, and therefore we leave the issue for another day.

### B.  Notice of supplemental points and authority

The defendant also filed a document entitled "notice of supplemental points and authority" in which he attempts to resurrect his challenge to the search of his residence. However, the

document does not identify the search warrant to which it refers, the grounds on which he challenges the warrant are unclear, and it does not elaborate on what evidence he believes the court should or should not consider. Further, although the district court denied several motions to suppress in this case, Reynolds does not take issue with any of those decisions specifically. He simply asserts that the search of his residence was not supported by probable cause. But those issues must be raised before trial. Fed. R. Crim. Pro. 12(b)(3)(C). We do not consider them properly presented here.

### C.  Motion to discharge Kevin Schad as appellate counsel

The defendant seeks to have the Court replace his appointed appellate counsel, Kevin Schad, or in the alternative "release my employers funds to that they can provide for a private attorney." Mot. at 8. The defendant alleges that after he presented Mr. Schad with evidence that his conviction was a result of a conspiracy and numerous violations of the defendant's constitutional rights, Mr. Schad stopped responding to the defendant's phone calls and emails. The defendant disagrees with Mr. Schad's strategic decisions, including his unwillingness to file a supplemental brief discussing the conspiracy alleged by the defendant.

Mr. Schad likewise has filed a motion seeking permission to withdraw as counsel of record and asks that the court grant the defendant leave to proceed *pro se*. Mr. Schad states that he was informed by the U.S. Marshal Service that there was an ongoing threat investigation involving the defendant that places appellate counsel in a conflict of interest.

We believe that appellate counsel has done a commendable job of challenging the defendant's convictions, and the full breadth of the issues generated by the proceeding below has

been presented to us.  Appellate counsel has admirably discharged his duties, and his motion to withdraw is **GRANTED**.

## D.  Other filings

The defendant has submitted several other filings consisting of citations to more authorities and affidavits.  We view these as attempts to expand the record or prolong the briefing, all without leave of court.  To the extent that the filings may be characterized as motions, we deny them for lack of merit in the grounds presented.

## IV.

After a thorough review of the record and the issues raised, we are confident that no reversible error was committed by the lower court.  Therefore, the defendant's convictions and sentences are **AFFIRMED.**